SANDRA CABRINA JENKINS, Judge.
| iDefendant, Stanley Berniard, was charged by grand jury indictment with the second degree murder of Alvin Crosby on August 15, 2010. Following a three day jury trial, the jury found defendant guilty as charged. Defendant now appeals his conviction for second degree murder, raising seven assignments of error. Upon our review of the record in light of thé applicable law, we find no merit in defendant’s assignments of error and we affirm.
STATEMENT OF THE CASE
On May 5, 2011, the grand jury indicted defendant for the second degree murder of Alvin Crosby. Defendant appeared for arraignment on May 20, 2011, and pled not guilty. Trial commenced on October 22, 2013.[1] Following a three day jury trial, defendant was found guilty as charged of second degree murder. Defendant filed motions for post-verdict judgment of acquittal and for new trial. On October 31, 2013, the trial court denied defendant’s motions and sentenced ^defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant’s timely appeal followed.
FACTS
Detective Ryan Aucoin of the New Orleans Police Department was assigned as the lead detective in the investigation of Alvin Crosby’s murder. On August 15, 2010, when Det. Aucoin arrived at the crime scene, he observed the victim’s car, a brown or tan colored Saturn, parked on South Roman Street. Det. Aucoin stated that he observed several bullet casings on the ground in the middle of the street and near the sidewalk next to the victim’s car.[2]
Det. Aucoin’s investigation revealed the shooting occurred near LSU medical facility buildings and within one block of a nightclub, Club NV. Det. Aucoin learned from the manager of Club NV that the club was open on the night of the shooting; but there was no video surveillance from the nightclub. Canvassing the area for information and witnesses did not yield any witnesses to the shooting or witnesses willing to give information. Det. Aucoin *76 did learn, however, that video surveillance cameras mounted to the LSU medical facility buildings captured video footage of the shooting from two different angles.
Det. Aucoin viewed the video footage for the first time on a cellphone.[3] On the video, Det. Aucoin observed a person wearing a white v-neck t-shirt and blue jeans walk from Perdido Street and turn onto South Roman Street; the person ^walked around a black SUV parked on South Roman, pulled out a firearm from his right side waistband, and, as the victim was getting into his vehicle, the person walked up to the side of the victim’s car and started firing gunshots into the side of the car; then the shooter fled on foot in the direction from which he came. Det. Aucoin testified that, even viewing the video on a cellphone screen, he recognized defendant as the shooter in the video.
Det. Aucoin noted the shooter’s walk, the way he carried himself, his complexion and his haircut matched what Det. Aucoin knew of defendant. Det. Aucoin testified that, prior to this homicide investigation, he had seen photographs and videos depicting the defendant, who he also knew by the nickname “Poppy.” Det. Aucoin also had observed defendant in person on several occasions and had become familiar with defendant’s physical appearance, mannerisms, and the manner in which defendant walked or carried himself. Based on his prior familiarity with defendant, Det. Aucoin recognized defendant as the shooter in the video surveillance footage of the murder. _
The next day, Det. Aucoin obtained 'a CD copy of the video surveillance footage from the LSU medical facility and he watched the same video footage on a 21-inch computer screen which provided a larger, clearer video image' than he had previously viewed. Det. Aucoin confirmed his initial observations and his recognition of defendant as the shooter. He was also able to observe that the white v-neck t-shirt worn by the shooter had black lettering on it and the shooter was wearing a large white wristwatch on his left wrist. Det. Aucoin testified that after viewing the video surveillance footage the second time he was certain that defendant was the shooter in the video. Det. Aucoin documented his identification of the shooter in his case report, but he did not immediately arrest defendant. Det. |4Aucoin continued his investigation in order to corroborate his identification with further facts and evidence.
Det. Aucoin spoke with the victim’s mother and two friends about the victim’s whereabouts on the night of the shooting. He learned that the victim had been at Club NV for a record label party that night. Det. Aucoin acquired and reviewed over 300 photographs taken at the party at Club NV by a professional photographer.[4] *77 Det. Aucoin identified three photos that depicted defendant standing with other individuals; the photos were marked with a time of 2:36 a.m. and 2:37 a.m., respectively. In one photo, Det. Aucoin observed defendant wearing a large white wrist watch on his left hand and holding a bottle of champagne.
During Det. Aucoin’s testimony, a DVD containing the video surveillance footage was played for the jury. Det. Aucoin narrated parts of the video, identifying the victim walking to and entering his car, and identifying defendant as the person walking around a black Escalade SUV, approaching the victim’s car, firing several shots into the side of the car, and fleeing on South Roman Street. Det. Aucoin noted the similarities of defendant’s clothing seen in the video to that seen in the photographs. He specifically noted that the shooter was a “light skin black male,” who appeared to be short, wearing a white t-shirt with black lettering forming a long word on top of two smaller words and another longer word at the [ ^bottom, “which matches the Free CO BJ Bolo” that defendant wore inside Club NV that night, as seen in the photos. Det. Aucoin also stated that the video was released to the media “to try to get the publics [sic] interest in assisting and identifying the shooter.” Det. Aucoin testified that he also enlisted the assistance of the ATF to determine if the clothing worn by the shooter in the video matched the clothing worn by defendant in the photographs from Club NV.[5]
In February 2011, approximately six months after the homicide, Det. Aucoin located an eyewitness, Chaz Adams. Mr. Adams met with Det. Aucoin at the NOPD Homicide office to give a recorded statement. Det. Aucoin learned that Mr. Adams was present at Club NV the night of the shooting and he identified defendant and the victim as- persons he had seen inside Club NV on August 15, 2010.[6] Upon leaving the club, Mr. Adams witnessed the shooting and he identified “Poppy” as the shooter. At that point, Det. Aucoin showed Mr. Adams a six-person photographic lineup, from which Mr. Adams picked out defendant as the shooter. Det. Aucoin testified that Mr. Adams was also able to describe where he was located at the time of the shooting; where the victim was located at the time of the shooting; the type of car the victim was in; where defendant was when he fired the shots. Based on the identification and statement obtained from Mr. Adams, Det. Aucoin obtained an arrest warrant for defendant.
| fiChaz Adams testified that he had known defendant for at least fifteen years. Mr. Adams confirmed that he knew defendant by the nickname “Poppy” and he made an in-court identification of defen *78 dant. Mr. Adams testified that he attended the party at Club NV in the early morning hours of August 15, 2010, and he identified photos of himself at the club that night. Mr. Adams stated he was in the VIP section of the club, where he saw defendant get into an argument with the victim when defendant sprayed a bottle of champagne on some people in the crowd. A while later, Mr. Adams left the club and was walking in the street towards his car when he heard gunshots and he saw defendant shooting into the driver’s side door of a brown Saturn. Mr. Adams initially ran away from the shooting, but he returned to his car moments later and drove away. As he drove away, he looked into the brown Saturn and saw someone slumped over in the driver’s seat. A portion of the video surveillance footage was played during Mr. Adams’s testimony; he identified defendant as the shooter in the video as well as his own car driving away from the scene after the • shooting. Mr. Adams testified that he was certain defendant was the person he saw shooting into the brown Saturn on August 15, 2010.
Mr. Adams stated that he did not report what he saw to NOPD that day and he did not come forward as a witness until six months later, stating that he “didn’t want repercussions to come on me.” Approximately six months after the shooting, Mr. Adams told his friend, Kerry Johnson, that he saw defendant commit the murder outside Club NV. Ms. Johnson encouraged Mr. Adams to “do the right thing” and she connected him with Agent Jason Townsend. Mr. Adams had a brief |7telephone conversation with Agent Townsend and indicated that he knew who committed the murder outside Club NV. The next day, Mr. Adams decided to go with his friend Ms. Johnson to NOPD and give a statement to Det. Aucoin. Mr. Adams testified that he was not forced, threatened, or coerced to give a statement to Det. Aucoin or to identify defendant as the person who committed the murder.
Mr. Adams confirmed that he was currently in jail pursuant to a material witness bond. He stated that he feared for his safety after defense counsel learned that he was a witness in this case; consequently, he did not mind being in jail prior to trial. Mr. Adams denied that Kerry Johnson bribed him with pain pills to identify defendant in this case.
Kerry Johnson testified that she had known defendant since childhood; they had grown up in the same neighborhood and attended the same elementary school. She stated that she had known Mr. Adams since 2007 and met him through Louis Robertson, who also was acquainted with defendant. Ms. Johnson testified that in February, 2011, she was driving with Mr. Adams in the car when she learned that he knew who committed the murder outside Club NV. She encouraged him to call Cri-mestoppers. She then decided to call Agent Jason Townsend, who was the lead detective in the investigation of her brother’s murder, and she handed the phone to Mr. Adams for him to speak with Agent Townsend. The next day, she went to NOPD Homicide office with Mr. Adams where they met with Agent Townsend and Det. Aucoin. While in Det. Aucoin’s office, Ms. Johnson viewed the video of the shooting. Based on her longtime familiarity with defendant, she recognized and identified defendant as the shooter. She confirmed on cross-examination that she did not witness the shooting in person.
IjjTo corroborate Det. Aucoin’s identification of the defendant, the State called Agent Jason Townsend, a Special Agent with the ATF, to testify as to his familiarity with the defendant. Agent Townsend identified defendant in the courtroom and stated that he first “became aware of’ *79 defendant in December of 2009, approximately eight or nine months prior to the murder of Mr. Crosby.[7] Prior to the murder on August 15, 2010, Agent Townsend had seen several photographs of defendant and seen him in person on several occasions. Agent Townsend testified that he was familiar with defendant’s physical appearance, the way defendant carried himself, and his mannerisms. Agent Townsend was shown the video of the shooting in court; he testified that he had done enough investigation on defendant to recognize him as the shooter in the video.
Agent Townsend testified that Mr. Adams had information about the murder outside Club NV and his exact words to Agent Townsend on the phone were “I saw Poppy kill that guy.” Agent Townsend knew, prior to that conversation, that defendant used the nickname “Poppy.” Agent Townsend was present at the NOPD Homicide office when Mr. Adams gave his statement to Det. Aucoin. Agent Townsend stated that Det. Aucoin did not coerce Mr. Adams into making a statement or identifying defendant as the shooter; and Mr. Adams was not shown the video prior to giving his statement.
Det. Aucoin, recalled as a witness by the defense, testified that the video clearly depicted other eyewitnesses to the murder of Mr. Crosby besides Mr. | ,,Adams. Mr. Adams was the only cooperating eyewitness and Det. Aucoin did not talk to any other eyewitnesses to this murder.
The day after his interview with Mr. Adams, Det. Aucoin arrested defendant. Det. Aucoin advised defendant that he had been arrested on a charge of second degree murder and advised defendant of his Miranda rights. Defendant agreed to give a recorded statement and portions of that recorded statement were played for the jury. Defendant indicated to Det. Aucoin that he had alibi witnesses; Det. Aucoin stated that he was only able to locate one individual named by defendant as a corroborating witness; but that individual did not corroborate defendant’s statement.
ERRORS PATENT
Our review of the record for errors patent reveals one. The transcript of the sentencing hearing reflects that the trial court imposed defendant’s sentence less than twenty-four .hours after denying his motions for post-verdict judgment of acquittal and for new trial, in violation of La.C.Cr.P. art. 873. Pursuant to La. C.Cr.P. art. 873, the trial court shall not impose sentence until at least twenty-four hours after denying a motion for new trial, unless the defendant expressly waives the delay.
The transcript of the sentencing hearing does not indicate that defendant expressly waived the twenty-four hour delay as contemplated by La.C.Cr.P. art. 873. However, this Court has held that the trial court’s failure to observe the required twenty-four hour delay is harmless error where the defendant does not complain of his sentence on appeal. State v. Celestain, 13-1262, p. 10 (La.App. 4 Cir. 7/30/14), 146 So.3d 874, 881; State v. Duncan, 11-0563, p. 8 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 511. In addition, the trial court’s failure to observe the |indelay is harmless error where the sentence imposed was mandatory. Duncan, 11-0563, p. 8, 91 So.3d at 511; State v. Seals, 95-0305, p. 17 (La.11/25/96), 684 So.2d 368, 380. Here, the trial court sentenced defendant to life *80 imprisonment without parole, probation, or suspension of sentence, as mandated by La. R.S. 14:30.1, and defendant does not complain of his sentence on appeal. Thus, this trial court error is harmless.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant argues that the evidence presented was insufficient to support his conviction for second degree murder.
This Court set forth the applicable standard of review for evaluating the sufficiency of evidence in State v. Ragas, 98-0011, p. 13 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-07, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, a,n appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may hot disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mus-sall; Given, supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In reviewing, the record for sufficiency of evidence, conflicting statements as to factual matters relate to the weight of the evidence, not its sufficiency; the determination of whether the testimony of one witness is to be believed over that ¡of another rests with the trier of fact. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996 (citing State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989)). “In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion.” State v. Higgins, 03-1980, p. 6 (La.4/1/05), 898 So.2d 1219, 1226. The trier of fact’s decision as to the credibility of witnesses will not be disturbed unless it is clearly contrary to the evidence. State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306.
All evidence, both direct and circumstantial, must meet the Jackson reasonable doubt standard. Ragas, 98-0011, p. 14, 744 So.2d at 107. “[W]here circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, ‘assuming every fact to be proved that the evidence tends to prove.’ ” State v. Draughn, 05-1825, p. 7 (La.1/17/07), 950 So.2d 583, 592 (quoting La. R.S. 15:438). Where the identity of the perpetrator is disputed, “the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson.” State v. Everrett, 11-0714, p. 15 (La.6/13/12), 96 So.3d 605, 619. Ultimately, the State must prove every element of the offense, including the identity of the perpetrator, beyond a reasonable doubt.
*81 In order to prove second degree murder, the State must show the killing of a human being and that the defendant had the specific intent to kill or inflict great bodily harm upon the victim. La. R.S. 14:30.1. Specific intent “exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). “Specific intent may be inferred from the circumstances and the defendant’s actions.” State v. Everrett, 11-0714, p. 14 (La.6/13/12), 96 So.3d 605, 619; State v. Bishop, 01-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437.
In this case, we find that the testimony and evidence presented supports the jury’s finding that defendant had the specific intent to kill. The video surveillance footage of the shooting was played for the jury during trial. The video depicts the victim getting into his car; the shooter walks around a black SUV, approaches the victim’s car, pulls a gun from his waistband, and fire several gunshots into the driver’s side door of car. Det. Aucoin testified that the victim sustained six gunshot wounds, including to the chest and face, and photos of the autopsy were viewed by the jury.
Based on the evidence viewed by the jury, along with the eyewitness testimony discussed below, we find that rational jurors could reasonably infer a specific intent to kill from the circumstances of the shooting and defendant’s actions. See Everett, 11-0714, p. 14, 96 So.3d at 619; State v. Broaden, 99-2124, pp. 19-20 (La.2/21/01), 780 So.2d 349, 362.
Defendant argues, however, that the evidence was insufficient to establish beyond a reasonable doubt that he was the shooter. He contends the State failed to satisfy its burden of proof to negate any reasonable probability of misidentification.
When the State’s case rests on eyewitness identification of the defendant without other corroborating physical evidence, we examine the reliability of the identification by application of the five-factor test set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977): (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the perpetrator; (4) the level of certainty demonstrated by the witness; and (5) the length of time between viewing the crime and the confrontation. See Everett, supra; State v. Brealy, 00-2758, p. 8 (La.App. 4 Cir. 11/7/01), 800 So.2d 1116, 1121. In this case, the State presented the testimony of one eyewitness, video footage of the shooting, and identification testimony from three other witnesses.
Mr. Adams testified that he had known defendant for fifteen years and that he was very familiar with defendant prior to August 15, 2010. On the night of the murder, Mr. Adams saw defendant at Club NV; he identified photos of himself and defendant at the club taken less than two hours prior to the murder. Mr. Adams also testified that he saw defendant get into an argument with the victim inside the club. Shortly thereafter, Mr. Adams left the club and was walking to his car when he heard the gunshots and saw defendant standing with a gun shooting into the victim’s car. Mr. Adams described in detail where he was standing when the shooting occurred, and that defendant was standing next to a brown Saturn and shooting into the driver’s side door of that car. The jury also saw crime scene photographs depicting the bullet casings found next to the brown Saturn and the bullet holes in the driver’s side door. Most significantly, Mr. Adams testified that he was certain *82 that defendant was the person he saw shooting into the victim’s car. Mr. Adams also identified defendant on the video surveillance footage as the shooter.
We find that Mr.' Adams’s testimony established that he had an ample opportunity to view defendant at the time of the crime; he was sufficiently aware of the surroundings and sequence of events; he had ample familiarity with the defendant to be able to accurately identify him as the shooter; and he demonstrated a high level of certainty. Mr. Adams explained that he did not come forward with |14his eyewitness statement until several months later because he was afraid of the repercussions of coming forward. When he did give his statement, Mr. Adams testified that he was certain of the identity of the shooter and he was not coerced into identifying defendant.
Based on our review of his testimony, Mr. Adams’ testimony meets at least three out of the five criteria for reliability. Ultimately, the jury determines the credibility of witnesses and the weight to give to each witness’s testimony. Thus, having found no internal contradiction in Mr. Adams’ testimony or. irreconcilable conflict with other evidence or testimony, we find that Mr. Adams’ testimony alone was sufficient for the State to meet its burden of negating any reasonable possibility of misidenfy fication.
The State also presented the testimony of three witnesses who were able to identify defendant from viewing the video of the shooting. Det. Aucoin testified that, prior to August 15, 2010, he had seen defendant in person and was familiar with defendant’s physical appearance, mannerisms, his walk, .and the manner in which he carried himself. Based on his familiarity with defendant, Det. Aucoin testified that he recognized defendant as the shooter in the video surveillance footage. Det. Au-coin also identified photos of defendant taken inside Club NV less than two hours prior to the murder; he noted in the photos that defendant was wearing a white t-shirt with black lettering and a large white wristwatch as could also be seen on the shooter in the video.
ATF Special Agent Jason Townsend and Kerry Johnson also identified defendant as the shooter in the video. Agent Townsend testified that he had been familiar with defendant since 2009 and he was familiar with his appearance, mannerisms, and walk. Kerry Johnson testified that she had known defendant |, ¿since childhood, attended school with him, socialized with him through the years, and was very familiar with him. Agent Townsend and Kerry Johnson each testified to the circumstances of having initially viewed the video surveillance footage of this murder; and based on their prior familiarity with defendant, both testified to being certain that defendant was the shooter in the video.
Based on our review of the record, we find no irreconcilable conflict or clearly contrary evidence to these witnesses’ testimony. See Higgins, supra; Wells, supra. Furthermore, the jurors had several opportunities to view the video of the shooting, to view the defendant in court, and to determine the credibility of all testimony and evidence. Viewing all of the evidence and testimony in the light most favorable to the prosecution, any rational juror could find beyond a reasonable doubt that defendant shot the victim with the specific intent to kill him or to inflict great bodily harm. Thus, the evidence was sufficient to support defendant’s conviction for second degree murder, and this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant argues that he was denied his right to a fair trial as the result of improp *83 er and prejudicial comments made by the trial court and by the State throughout the trial. Addressing defendant’s complaints against the trial court and then the State, we find no merit in this assignment of error.
The complete neutrality of the trial court is an essential element of a fair trial. State v. Jones, 593 So.2d 802, 803 (La.App. 4 Cir.1992); State ex rel. Whiticar v. Butler, 576 So.2d 515, 516 (La.1991). The trial court shall not comment upon or express any opinion as to the facts of the case, the evidence, or testimony presented. La.C.Cr. P. art. 772. The trial court shall administer the law and assist in the search for truth while remaining impartial and ensuring that proceedings are conducted with dignity and in an orderly and expeditious manner. See State v. Baldwin, 388 So.2d 679, 686 (La.1980); La. C.Cr.P. art. 17.
A trial court’s disparaging remarks or intemperate criticism of defense counsel may constitute reversible error when such remarks adversely influence and prejudice a jury against a defendant. State v. Gilmore, 529 So.2d 859, 862 (La.App. 4 Cir.1988). To constitute reversible error, the effect of the improper comments must be such as to have contributed to the verdict, thereby denying defendant a fair trial. State v. Diggins, 12-0015, p. 14 (La.App. 4 Cir. 10/23/13), 126 So.3d 770, 784; State v. Johnson, 438 So.2d 1091, 1102 (La.1983). However, if the guilty verdict actually rendered was surely unattributable to the trial court error, then the error is harmless. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
Defendant contends that certain comments and conduct by the trial court indicated a bias against defense counsel, prejudiced defendant, and constitute reversible error. In support of his claim, defendant cites three comments by the trial court to defense counsel during trial. First, defendant complains that the trial , court chastised defense counsel for using “speaking objections.” However, defendant does not cite to the record and we find nothing in the record to support this claim. Moreover, defendant has not shown how the trial court’s manner of overruling objections prejudiced defendant.
Next, defendant complains of comments made by the trial court during the direct examination of witness Cameron Knowles, the photographer at Club NV. The State sought to introduce more than 300 photographs taken by Mr. Knowles at |17Club NV in the hours prior to the murder. The State commented that the process of introducing the photographs would take a bit of time due to the lack of stipulation from the defense. The trial court then addressed defense counsel, stating:
THE COURT: Is that what we are doing? Are you going to allow the question, did you take all of these photographs or are you going to make him ask him one photograph at a time?
In response, defense counsel asked for an initial stipulation from the State that the photographs being introduced were those turned over previously to defense on a CD. The State stipulated as requested by defense counsel, and the photographs were authenticated and introduced en globo. Defendant contends, however, that the trial court’s question and “exasperated tone” disparaged defense counsel in front of the jury. Having reviewed the entirety of the exchange between the trial court, the State, and defense counsel, we find no intemperate criticism of counsel by the trial court; rather, we find the trial court *84 acted in. a manner consistent with its duty of conducting an orderly, expeditious trial.
Defendant next complains that the trial court mocked defense counsel during the cross examination of Det. Richard Chambers. Defense counsel asked Det. Chambers if it would refresh his memory “to look at the report that was written about this case?” The trial court interjected and asked if defense counsel was referring to Det. Chambers’ report or someone else’s. When defense counsel stated that it was Det. Aucoin’s report, the trial court responded as follows:
THE COURT: How are you going to ask him to opine as to what is contained in someone else’s report?
MS. ANGELSON: Judge, he can use whatever he needs to refresh his recollection.
hsTHE COURT: You want him to rely on someone else’s report to refresh his recollection?
MS. ANGELSON: Yes, Judge, that’s—
THE COURT: [addressing the witness] Do you have any independent recollection as to whether or not — what was the question about the casings? I mean about whether or not there were witnesses who were interviewed that did not allegedly see the shooting?
[WITNESS]: I can’t recall.
THE COURT: And would it refresh your recollection of that fact to look at the report that was written by Detective Aucoin about your investigation that night?
[WITNESS]: I still wouldn’t recall. I don’t recall.
MS. ANGELSON: Okay, thank you.
In regards to the above exchange, defendant complains that the trial court used a mocking tone which disparaged defense counsel and, consequently, prejudiced the jury against defendant.
From our review of the transcript, the trial court’s comments do not indicate intemperate criticism or disparagement of defense counsel. The trial court rephrased defense counsel’s questions to ascertain Det. Chambers’ recollection of his participation in the investigation. The trial court’s conduct and comments were consistent with its function as a moderator of trial. See La. C.E. art. 611(A);[8] State v. Draughn, 05-1825, pp. 47-48 (La.1/17/07), 950 So.2d 583, 616; State v. Rochon, 98-717, pp. 7-8 (La.App. 5 Cir. 3/10/99), 733 So.2d 624, 629 (finding the trial court’s statement merely clarified the prosecutor’s questions of the witness). As such, the trial court’s comments were neither disparaging nor improper. Thus, we find defendant’s complaint regarding the trial court’s comments without merit.
Next, defendant argues that the State’s improper and prejudicial comments during closing arguments denied defendant a fair trial and constitute reversible error.[9] The proper scope of arguments “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw *85 therefrom, and to the law applicable to the case.” La.C.Cr.P. art. 774. The State’s closing arguments “shall not appeal to prejudice” and the State should refrain from making personal attacks against defendant and defense counsel. La.C.Cr.P. art. 774; see State v. Celestine, 12-1541, p. 10 (La.App. 4 Cir. 12/18/13), 131 So.3d 947, 954; State v. Manning, 03-1982, p. 75 (La.10/19/04), 885 So.2d 1044, 1108. However, this Court affords wide latitude to the State in its closing arguments; even where the State’s closing exceeds the scope of proper arguments, this Court “will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict.” State v. Jones, 10-0018, p. 9 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 833 (quoting State v. Clark, 01-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183).
Defendant complains that the State inflamed the passions of the jury by “repeatedly drawing attention to the fact that defense counsel was from Oregon, while the State attorney was from New Orleans,” and by asking the jury to consider the personal experiences of a mother who has lost a child when deciding the facts of this case.
| apFirst, defendant cites to the following comment by the prosecutor during the State’s rebuttal argument:
MR. NAPOLI: In this building we can become pretty callous. You can become jaded. You can just forget the good in anybody. They want to argue that [Kerry Johnson] had something against Stanley Berniard. Can’t we just consider for a moment that when she heard that when someones [sic ] loved one was taken from them, that when she heard that Chaz knew who committed that horrible murder that she just decided to do the right thing. Have we become so jaded in this city that we can’t even consider that and we had to come up with some theory about pills? Now I know Mr. Rizzio grew up in Oregon. I grew up in New Orleans and that is not us. We are better than that!
Defense counsel objected that the comment was a direct slight? to him; the trial court overruled the objection. The prosecutor’s comment referred to defense counsel’s cross examination of Kerry Johnson and closing arguments in which defense counsel suggested that Ms. Johnson had bribed Chaz Adams with prescription drugs to identify defendant as the person who committed this murder. Although the prosecutor used a personal reference to defense counsel’s background that could be viewed as improper, we must give credit to the good sense and fair-mindedness of jurors in separating the brief comment from the weight of the facts and evidence presented at trial. See State v. Bailey, 12-1662, pp. 7-8 (La.App. 4 Cir. 10/23/13), 126 So.3d 702, 707. Having heard the testimony of Ms. Johnson and Mr. Adams for themselves, we are not convinced that the State’s comment about defense counsel would have influenced the jury in rendering its verdict.
^Defendant also complains of a second comment by the prosecutor about defense counsel being from Oregon:
MR. NAPOLI: Our most important piece of evidence, ladies and gentlemen was Chaz Adams. Mr. Rizzio says that it is absolutely ridiculous that Chaz would want to stay in jail. Let me tell you something. That [sic] something that may be the case in Oregon but it is certainly not the case here.
Although the prosecutor’s comment makes another unnecessary direct reference to defense counsel, it was a brief comment in *86 the broader context of the rebuttal argument. The prosecutor was rebutting the defense closing argument in which defense counsel characterized as' “ludicrous” Chaz Adams’ testimony that he did not mind being in jail on the material witness bond because he feared for his life. The prosecutor’s comment arguably exceeded the bounds of proper argument by drawing .a distinction between defénse counsel’s experience and the experiences of the jurors; however, in consideration of the entirety of the testimony and evidence presented to this jury during the three day trial, we are not convinced that the prosecutor’s brief remarks about defense counsel would influence this jury and contribute to the verdict.
Defendant recites several other examples of objectionable comments by the prosecutor during the State’s closing and rebuttal arguments.[10] We have reviewed each of the prosecutor’s comments to which the defendant objected at trial. From our review of the State’s closing and rebuttal arguments, we do not find that the prosecutor exceeded the bounds of proper argument in such an inflammatory and | «^.prejudicial manner that would influence the jury in rendering its verdict. The prosecutor reviewed the testimony presented and referenced the evidence and lack thereof. Although the prosecutor also made references to his own experience as a prosecutor and made brief but direct comments regarding defense counsel, the jury was instructed that the arguments of counsel were not evidence to be considered in rendering a verdict. In addition, given the extensive testimony and evidence presented to the jury and giving credit to the good sense and fair-mindedness of the jurors, we are not convinced that the prosecutor’s comments during closing arguments had any influence on the jury in rendering the verdict.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, defendant argues that the trial court erred in denying defendant’s motion to continue following a last-minute disclosure of Brady [11] material by the State.
Defendant raised this issue in a previous application for supervisory writs which this Court denied.[12] On the day scheduled for trial, October 21, 2013, defense counsel filed a motion for further discovery, a motion to exclude testimony, and a motion for continuance. Defense counsel argued that they had just “accidently discovered” that the State intended to call Kerry Johnson as a witness and that Ms. Johnson was “extremely biased” against defendant because she believed he had killed her brother. At the trial court hearing, defense counsel argued that the State knew of Ms. Johnson’s bias, and her undisclosed bias against [ ^defendant constituted Brady material; consequently, the defense requested a continuance and further discovery to prepare for Ms. Johnson’s testimony. The trial court denied the defendant’s motions *87 and defendant sought immediate supervisory review in this Court. Upon this Court’s review of defendant’s writ application and review of the per curiam submitted by the trial court, this Court denied defendant’s writ on the merits, finding no abuse of discretion by the trial court in denying defendant’s motion for further discovery,' motion to exclude testimony, and motion to continue.[13]
On appeal, defendant reasserts the argument that the trial court erred in its denial of the motions. In response, the State argues that this issue has been fully litigated and, as such, should not be considered, pursuant to the law-of-the-case doctrine.
This Court explained our application of the law-of-the-case doctrine in State v. Duncan, 11-0563, p. 26 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 521, as follows:
Under the law-of-the-case doctrine, courts of appeal generally refuse to reconsider their own rulings of law on a subsequent appeal in the same case. Pitre v. Louisiana Tech University, 95-1466, p. 7 (La.5/10/96), 673 So.2d 585, 589. This court has stated that an appellate court will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. State v. Gillet, 99-2474, p. 5 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, 728. The law of the case? doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. State v. Molineux, 11-0275, p. 3 (La.App. 4 Cir. 10/19/11), 76 So.3d 617, 619.
Our application of the law of the case doctrine is discretionary, and this court will generally not follow the doctrine if the defendant can show that the prior ruling was clearly erroneous or produced an unjust result. See State v. Watson, 99-1448, p. 21 (La.App. 4 Cir. 8/23/00), 774 So.2d 232, 243; see also, State v. Diggins, 12-0015, p. 12 (La.App. 4 Cir. 10/23/13), 126 So.3d 770, 783, writ denied, 13-2742 (La.5/23/14), 140 So.3d 723.
In this appeal, defendant reasserts the same argument presented in his October 21, 2013, writ application to this Court. Defendant argues, then and now, that a continuance was necessary to investigate the basis and strength of Ms. Johnson’s bias toward defendant. Defendant presents no new evidence or legal theory tending to show that this Court’s writ denial, finding no abuse of discretion by the trial court in its ruling, was clearly erroneous or produced an unjust result as to this issue. Consequently, applying law of the case doctrine, we-decline to reconsider this issue on appeal and this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error, defendant argues that the trial court erred in denying the defense’s request to individually voir dire the jurors regarding media coverage of the trial or in failing to order a mistrial due to media coverage.
On October 23-, 2013, an article about defendant’s ongoing trial was posted on NOLA.com, the affiliated website of the local newspaper The Times-Picayune.[14] *88 The next morning, on the third day of trial, defense counsel made an oral motion for the trial court to individually voir dire jurors as to whether any juror had encountered any media coverage about this case. Defense counsel did not state or contend that the NOLA.com article had appeared in the local 1 ^newspaper; rather, he stated that a juror had walked into the courtroom that morning “with a newspaper in hand.” The trial court responded, “I already read the newspaper from cover to cover and its not in there.” The trial court denied the defense’s request to question jurors individually, but the trial court stated it would question the jury as a group to determine whether any jurors had encountered news coverage about this trial.
Before trial resumed that morning, the trial court asked the jurors collectively whether anyone watched the news on the previous night or saw anything about this case. As a whole, the jurors replied in the negative. The trial court then specifically asked, “[njobody went to NOLA.com?” One juror responded to the trial court by asking, “[w]as something on there? Did you see it?” The trial court replied that it was his job to watch for any news coverage of the trial, and inquired again whether anyone had seen anything. No jurors responded, whereupon the trial court concluded its inquiry and called for the State to present its next witness.
Defendant contends that the trial court’s questions to the jury as a whole were insufficient to determine whether the jurors had read or seen any media coverage of the trial and, thus, insufficient to assure defendant a fair trial. Defendant also argues that, due to the highly prejudicial information contained in then NOLA.com article, the provisions of La.C.Cr.P. art. 775 mandate a mistrial in this situation.
Under the relevant provision of La. C.Cr.P. art. 775, “upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial.” However, the record of this case does not reflect 12fithat defendant made a motion for mistrial on the basis of the potential prejudice from the media coverage of the trial or on the denial of the request to individually voir dire the jurors.[15] Defense counsel made only a motion to the trial court for individual voir dire of the jurors and did not argue a motion for mistrial on this basis. In addition, a mistrial is a drastic remedy that “is not warranted absent a determination that the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict.” State v. Russell, 416 So.2d 1283, 1290 (La.1982); see State v. Banks, 96-2227, pp. 3-4 (La.4/18/97), 692 So.2d 1051, 1053. Here, defendant puts forth no evidence that any juror actually read or saw any media coverage of this trial. Thus, we find no merit to defendant’s argument that the trial court erred in failing to declare a mistrial in accordance with La.C.Cr.P. art. 775.
*89 Furthermore, we find no abuse of discretion by the trial court in denying the motion for individual voir dire of the jurors regarding the media coverage. The trial court has broad discretion in determining whether, or to what extent, jurors may have encountered media coverage of the trial. Banks, 96-2227, p. 4, 692 So.2d at 1053. Given the absence of evidence that any juror read, saw, or encountered any media coverage of this trial, it cannot be said that the trial court abused its broad discretion in questioning the jury as a group rather than individually. Thus, this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 5
In this assignment of error, defendant argues that the trial court erred by admitting prejudicial and irrelevant testimony by certain State witnesses regarding the video surveillance footage of the murder. First, defendant argues that the trial court erred by permitting Det. Aucoin and Kerry Johnson to offer opinion testimony on the ultimate issue of fact in the case — the identity of the shooter; because such testimony usurps the entire function of the jury to determine the guilt of defendant. Defendant then argues that the trial court erred by permitting ATF Agent Michelle Beltz, a video analyst, to give irrelevant and unnecessary opinion testimony regarding enhanced images of the video surveillance footage in comparison to photographs depicting defendant.
Under La. C.E. art. 602, “[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself.” A lay witness, one who is not testifying as an expert, may also testify in the form of opinions or inferences, but “limited to those opinions or inferences which are (1) [r]ationally based on the perception of the witness; and (2) [h]elpful to a clear understanding of his testimony or the determination of a fact in issue.” La. C.E. art. 701.
Defendant argues that Louisiana law does not permit any opinion testimony tantamount to. finding the defendant guilty of the crime charged. In support of this argument, defendant cites two cases: State v. Wheeler, 416. So.2d 78 (La.1982) and State v. Montana, 421 So.2d 895 (La.1982). In Wheeler, the Louisiana Supreme Court held that the trial court had erred in permitting a narcotics officer toj^offer his opinion that the defendant had been involved in the distribution of marijuana, the crime with which he was charged. In Montana, the Court again found that the trial court erred in permitting a police officer, testifying as an expert in the field of illicit use and distribution of heroin, to offer his opinion that defendant had constructive possession of the heroin in his pocket with the intent to distribute the heroin. In both cases, the Court found that the officer’s testimony expressed an opinion on the ultimate determination of facts at issue — possession and intent — and, in both cases, the Court found the trial court error constituted reversible error.
However, contrary to defendant’s assertion that a witness may not offer testimony that goes to the ultimate facts at issue, La. C.E. art. 703 states, “[testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.”
In State v. Davis, 00-0275 (La.App. 4 Cir. 2/14/01), 781 So.2d 633, this Court rejected a claim of ineffective assistance of counsel based on counsel’s failure to object to a witness’s testimony identifying defendant’s handwriting. In that case, defen *90 dant was convicted of theft over five hundred dollars of cash payments remitted by patients at LSU Medical Center where defendant was a supervisor of bank transactions. During trial, a cash management supervisor identified defendant’s handwriting on a document admitted into evidence. Rejecting defendant’s claim of ineffective assistance of counsel for failure to object to the opinion testimony, this Court found that the witness’s testimony was rationally based upon her personal observations of his handwriting and was properly admitted.
In State v. Jefferson, 04-1960 (La.App. 4 Cir. 12/21/05), 922 So.2d 577, this Court found that the trial court did not err in permitting a detective to identify the voice on a 911 recording as that of a witness to the shooting of a police officer, for which defendant was charged and convicted of attempted first degree murder. In- that case, the detective testified that he had met with this witness, Mr. Lewis, and recorded an interview with him. At a later meeting with Mr. Lewis, the detective played the tape from their previous interview and the 911 tape of Mr. Lewis’s call to police about witnessing the shooting. Based on these interactions with Mr. Lewis, the detective testified that he was familiar with Mr. Lewis’s voice and identified his voice on the 911 tape played at trial. On appeal, defendant argued that the trial court erred in allowing the detective’s voice identification testimony. This Court found that the detective’s opinion testimony was rationally based on his perception, “ie. his recognition of Mr. Lewis’s voice”; further, this Court found that the testimony was helpful in determining facts at issue regarding the sequence of events prior to the shooting, which Mr. Lewis described in the 911 recording. This Court concluded the detective’s opinion testimony was permitted in accordance with the provisions of La. C.E. art. 701.
In the instant case, Det. Aucoin and Kerry Johnson both testified to being familiar with defendant, his physical appearance, his mannerisms, and the manner in which he carried himself. Ms. Johnson testified that she had known defendant since elementary school, they grew up in the same neighborhood, and she socialized with defendant throughout the years. Det. Aucoin testified that he was familiar with defendant prior to the murder on August 15, 2010; he had previously seen several photographs and videos of defendant and had opportunities to observe defendant in person. Both Det. Aucoin and Ms. Johnson testified to their 13nfamiliarity and personal knowledge of defendant, his appearance, walk, and mannerisms. Thus, both witnesses’ testimony — that defendant was the person seen in the video shooting at the victim’s car — was rationally based on their perceptions and familiarity with defendant. Their testimony was also helpful to the determination of a fact at issue— whether defendant was the shooter. Based on the foregoing, we find that both witnesses’ testimony meets the requirements of La. C.E. art. 701 regarding opinion testimony by a lay witness.
In addition, the trial court is vested with broad discretion in its determination of the admissibility of evidence during trial; and this Court will not disturb the trial court’s ruling on the admissibility of evidence absent a clear abuse of discretion. State v. Bell, 05-0808, p. 12 (La.App. 4 Cir. 12/6/06), 947 So.2d 774, 781. Considering the testimony given by Det. Aucoin and Ms. Johnson in light of the requirements of La. C.E. arts. 701 and 704, we find no abuse of discretion in the trial court’s admission of the identification testimony by *91 Det. Aucoin and Ms. Johnson.[16]
Likewise, we find no abuse of discretion by the trial court in permitting the opinion testimony of ATF Agent Michelle Beltz. Agent Beltz discussed comparisons and similarities between the video surveillance images of the shooter and the photographs depicting defendant in Club NV prior to the shooting. Defendant asserts that Agent Beltz testified as an expert in video analysis; however, the State did not offer her as an expert and the trial court did not qualify her as one'. In reference to Agent Beltz’s testimony, the record indicates that | ai defendant filed a motion in limine, on July 9, 2013, to exclude any opinion testimony “claiming expertise in the area of viewing video footage, or of commenting in any way on his or her conclusions about the contents of photos.” During a pre-trial hearing, the trial court heard arguments on this issue and denied the defense’s motion to exclude the opinion testimony as irrelevant and unnecessary. Although defendant complains that Agent Beltz’s testimony offered opinion testimony cloaked in an “air of expertise,” her testimony was admitted as opinion testimony pursuant to La. C.E. art. 701.
Agent Beltz testified that her title at the ATF was “Technical Surveillance Specialist” and her job involved analyzing sets of images and noting similarities and differences. In this case, Agent Beltz testified that Det. Aucoin sent her the video surveillance footage along with photographs depicting defendant, taken on the same date as the shooting (at Club NV), and requested that she focus on comparisons of the clothing. She stated that she compared images of the t-shirt worn by the shooter in enlarged and enhanced images from the video surveillance footage to images of the t-shirt worn by defendant in the photographs. She testified regarding the noted similarities and differences. Agent Beltz specifically stated that her job did not involve arriving at conclusions and she did not offer any conclusions in her testimony.
From our review of Agent Beltz’s testimony, in light of the requirements of La. C.E. art. 701, we find her testimony was rationally based on her experience in viewing video evidence and her perceptions of the photographic and video surveillance images provided to her; and her testimony was offered to help the jury |32in determining a fact in issue — whether the defendant was the person in the video surveillance footage. Considering the foregoing, we find no abuse of discretion by the trial court in allowing the opinion testimony of ATF Agent Beltz.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 6
In this assignment of error, defendant argues that he received ineffective assistance of counsel due to his prison transfer in June, 2013, from Orleans Parish Prison to a jail in another parish. Defendant claims that his transfer restricted his access to counsel in the weeks prior to his trial.
“As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted *92 if warranted.” State v. Laneheart, 12-1580, p. 9 (La.App. 4 Cir. 2/26/14), 135 So.3d 1221, 1229 (quoting State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802). If, however, the record on appeal contains sufficient evidence for a full review of defendant’s claim, then thq appellate court may address the issue in the interest of judicial economy. State v. German, 12-1293, p. 34 (La.App. 4 Cir. 1/22/14), 133 So.3d 179, 202; State v. Griffin, 99-1260, p. 3 (La.App. 4 Cir. 3/15/00), 756 So.2d 602, 604.
The record before us contains a defense motion, filed on July 9, 2013, to keep defendant in Orleans Parish Prison pending his trial.[17] The trial court signed an order denying the defense motion the same day. However, the record also | ^contains a trial court order signed on July 18, 2013, directing the Orleans Parish Criminal Sheriff, Marlin Gusman, “forthwith and in no case later than July 18, 2013” to “take back custody of Mr. Berniard, and maintain that physical custody within Orleans Parish until the conclusion of the above captioned case.” In his argument on appeal, defendant does not mention the trial court’s July 18, 2013 order. Although there is no indication in the record that the trial court’s order was not effectuated as ordered, defendant claims that he was “confined without means of communication” with his attorney “for several weeks prior to trial.”
Based on the foregoing, we find the record on appeal does not contain sufficient • evidence to resolve defendant’s claim of ineffective assistance of counsel on direct review. Accordingly, a review of this claim is better reserved for post-conviction relief where a full evidentiary hearing may be conducted if warranted.
ASSIGNMENT OF ERROR NO. 7
In his final assignment of error, defendant argues that the cumulative effect of the trial errors, even if no single error warrants reversal, has denied him the right to a fair trial.
Addressing this argument in numerous cases, the Louisiana Supreme Court has stated consistently that the combined effect of assignments of error lacking in merit does not aggregate to constitute reversible error. State v. Draughn, 05-1825, p. 70 (La.1/17/07), 950 So.2d 583, 629; State v. Harris, 01-2730, p. 68 (La.1/19/05), 892 So.2d 1238; State v. Strickland, 94-0025, pp. 51-52 (La.11/1/96), 683 So.2d 218, 239; State v. Copeland, 530 So.2d 526, 544-45 (La.1988); see also, State v. Williams, 13-0283, p. 35 (La.App. 4 Cir. 4/23/14), 137 So.3d 832, 858. Our review of each of defendant’s assignments of error, and review of the record as a whole, failed to reveal any reversible error. Consequently, we find noj^merit to defendant’s claim that the combined effect of the alleged errors deprived him of a fair trial and constitutes reversible error. This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Defendant filed numerous pre-trial motions that the trial court heard prior to trial. On the scheduled trial date, October 21, 2013, defendant filed a motion for further discovery, a motion to exclude testimony and identification, and a motion for continuance, which the trial court heard and denied on the same day. Defendant sought expedited supervisory review from this Court and the Louisiana Supreme Court; defendant's applications for supervisory review were denied on October 22) 2013. State v. Berniard, unpub., 2013-K-1439 (La.App. 4 Cir. 10/22/13); State v. Berniard, unpub., 2013-KK-2496 (La. 10/22/13), 124 So.3d 1088.

. Prior to Det. Aucoin’s arrival at the crime scene, the victim had been transported to the hospital and pronounced dead. Later that day, Det. Aucoin attended the autopsy and learned that the victim sustained six gunshot wounds, including gunshots to the chest, back, neck, and one to the face.

. Although LSU was unable to provide a CD copy of the video surveillance footage while NOPD was on the scene that morning, another NOPD detective viewed the video at the LSU facility and recorded the video surveillance footage on his cellphone. Det. Aucoin testified that he viewed the video footage of the shooting on the other detective’s cellphone before leaving the crime scene on the morning of August 15, 2010.

. Cameron Knowles, a professional photographer, testified that he was hired by Club NV to take photographs at a club event on August 15, 2010, from approximately 12 a.m. until 3 a.m. During Mr. Knowles' testimony, the State introduced en globo 300 photographs taken by Mr. Knowles at Club NV on that night. Mr. Knowles specifically identified five photos, marked as individual State’s exhibits, taken on August 15, 2010 between 2:07 a.m. and 2:37 a.m. Mr. Knowles confirmed that he had provided the State with a CD containing all 300 photos with time stamps for each photo. Mr. Knowles also testified that he did not know the identity of the persons in those photos and he acknowledged *77 that he did not take photos of every person at Club NV on August 15, 2010.

. Michelle Beltz, a technical surveillance specialist for the Alchol, Tobacco, and Firearm Division of the Department of Justice (ATF), testified that she compared images of the t-shirt worn by the shooter in the video with images of the t-shirt worn by defendant in the Club NV photos. She stated that her job was to note similarities and differences and make that report to the investigating agent or officer. Although she could not read the letters on the t-shirt in the video, Ms. Beltz noted that the positioning and spacing of the letters on the t-shirt in the video matched those from the t-shirt defendant wore in the club photos. She noted no differences in the clothing worn in the two images; she also looked through all photos taken at Club NV that night and she did not note any other individual other than defendant who resembled the image of the shooter on the video.

. Det. Aucoin identified two photos taken at Club NV on August 15, 2010, depicting Mr. Adams. The photos were marked with the times 2:06 a.m. and 2:07 a.m., respectively.

. Agent Townsend was not assigned to investigate the murder of Mr. Crosby, but he became involved with the investigation prior to the time that Ms. Johnson contacted him in February, 2011. Agent Townsend knew Ms. Johnson because he had been involved in the investigation of her brother's murder.

. La. C.E. 611(A) states, in pertinent part, that the court “shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) Make the interrogation and presentation effective for the ascertainment of the truth;”

. Defendant also complains of the State's references to Corey Berniard, defendant’s brother, during opening statements and in direct examination of Det. Aucoin. According to defense counsel, Corey Berniard was charged with four counts of first degree murder in a separate case in Orleans Parish Criminal Court that received extensive media coverage. However, defense counsel did not make contemporaneous objections to preserve for review the State’s alleged error in making references to Corey Berniard.

.Defendant states that several of the prosecutor’s inflammatory comments were not based on any evidence or legal arguments. In one instance, the prosecutor stated that the defense should get an "L" for “lying” or an "M" for "making stuff up.” In another example, the prosecutor stated that the most difficult part of his job was meeting with the mothers of murder victims, and he wanted to make sure this victim’s mother got justice.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holding that the State's suppression of evidence favorable to defendant violates defendant’s due process rights where such evidence is material to guilt or innocence regardless of its admissibility.

. State v. Berniard, unpub. 13-1439 (La.App. 4 Cir. 10/22/13).

. Id.

. The headline of the NOLA.com article from October 23, 2013, reads: "Man accused in 2006 Houston murder standing trial this week for gunning down New Orleans man in 2010.” The article relates details of the trial as well as defendant’s arrest history, including previous charges for first and second degree murder; the article also states that defendant had recently been charged by *88 Houston police with the murder of a Texas resident in 2006. Defendant does not contend that this article was published in the print edition of The Times-Picayune or that there was any other media or news coverage of the trial.

. Prior to raising the issue of prejudice from media coverage, the defense counsel made a motion for mistrial based on the assertion that three jurors possibly saw defendant sitting on a bench next to other criminal defendants wearing orange jumpsuits. The trial court denied that motion for mistrial and defendant does not raise that issue in this assignment of error or seek review of that ruling.

. We also note that the trial court took care to instruct the jury that the witness testimony involved the perception of witnesses and that the jury must determine the facts for themselves. During discussions with counsel regarding the admissibility of Ms. Johnson's testimony, the trial court stated that it would specifically instruct the jury, as it already had, “that although people are going to testify as to their perceptions of who somebody is[,] the ultimate decision and the ultimate determination is the exclusive province of the jury.”

. In that motion, defendant states that he was removed and transferred from Orleans Parish Prison to St. Charles Parish approximately three weeks prior to the filing of the motion. Defendant argues that his transfer effectively denies him of his Sixth Amendment right to effective assistance of counsel.