388 So.2d 679 (1980)
STATE of Louisiana
v.
Timothy George BALDWIN.
No. 66962.
Supreme Court of Louisiana.
September 3, 1980.
*681 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Carl Parkerson, Dist. Atty., Johnny Parkerson, Asst. Dist. Atty., Monroe, for plaintiff-appellee.
J. Randolph Smith, Smith & Hingle, Monroe, for defendant-appellant.
LEMMON, Justice.
Defendant was charged by bill of information with the crime of simple escape in violation of R.S. 14:110. After defendant's motion for a change of venue was heard and denied, defendant was tried and found guilty as charged by a unanimous jury verdict. The trial court sentenced defendant to five years (5) at hard labor, the sentence to run consecutively with any other sentence, as required by the statute. Defendant now appeals.
Facts:
In October, 1978 defendant was incarcerated in the Ouachita Parish jail, pending his appeal of a first degree murder conviction.[1]
On March 4, 1979 an investigation, prompted by observation of a makeshift rope hanging out of a fourth floor window of the jailhouse, revealed that hacksaw blades had been used to saw one of the bars and that defendant and three other prisoners had escaped. Local police communicated news of the escape to authorities in Cleveland, Ohio, where defendant's mother was residing. On March 7, 1979 an Ohio policeman, observing a vehicle which matched the description of the car the escapee was driving, stopped the car, radioed for verification, and asked defendant for identification, also asking if he was wanted. When defendant replied that he was wanted, he was arrested.
On March 9, 1979 defendant was transported back to Ouachita Parish, where on March 11, 1979 he waived his constitutional rights and made an inculpatory statement in connection with this offense.
Change of Venue
Defendant contends that the trial court erred in denying his motion for a change of venue. C.Cr.P. art. 622 provides:
"A change of venue shall be granted when the applicant proves that by reasons of prejudice existing in the public mind or because of undue influence, or that for any reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
In order for a defendant to be entitled to have his trial moved to another parish he must prove more than a mere knowledge by the public of facts surrounding the offense. Defendant's burden of proof is to show the existence of such prejudice in the collective mind of the community that a fair trial is impossible. State v. Sonnier, 379 So.2d 1336 (La.1980); State v. Matthews, 354 So.2d 552, (La.1978); State v. Sheppard, 350 So.2d 615 (La.1977). Whether the defendant has made the requisite showing is a question addressed to the trial court's sound discretion, and that court's decision will be disturbed on appeal only on an affirmative showing of abuse of discretion.
Considerations in determining whether to grant a request for a change of venue, as discussed in State v. Bell, 315 So.2d 307 (La.1975), include (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the *682 community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. See, generally, Annot., 33 A.L.R.3d 17 (1970). See also State v. Felde, 382 So.2d 1384 (La.1980).
As to the nature of pretrial publicity and degree of circulation in the community, the story of the escape was aired on March 4 and 5 on three newscasts on KNOE television, and another about defendant's reapprehension and transfer back to Monroe was aired once. The news director of KNOE, which covers 30 parishes or counties in three states, testified that this is not an unusual amount of publicity for an offense of this type.
A story concerning defendant's escape was broadcast three times on KNOE FM radio, which covers 19 parishes and has an audience of 375,400 people, and three more stories were broadcast after he was captured. The news director testified that there was nothing unusual about these broadcasts and that the station did not give any more publicity to this escape than to any other escape.
The Monroe News Star World, a newspaper whose morning edition had a circulation of 38,224 and whose evening edition had a circulation of 11,274 in April, 1979 in 16 parishes, carried several stories about defendant's escape. The Monday, March 5, 1979 issue gave front page coverage to the escape, with pictures of the four escapees and another article on the escape appearing in Section B. These stories gave the details of the escape and the names of those involved. Another story appeared in Section B of the evening edition with a headline reading "Escapees Sought". An article stating that the prisoners were still at large appeared in Section B of the March 6 morning and evening editions. On Thursday, March 8, 1979 the story of defendant's capture in Ohio ran in Section B of the morning edition, and another article about the capture appeared in the March 9 edition. Defendant's name was also mentioned in an article about one of the other escapees in the March 13 morning edition.
Thirteen people randomly selected from the community were called to testify at the hearing of the motion for a change of venue, and nine had read or heard about the escape.[2] One person commented that she had heard of several escapes and that it was possible that she read about this one, while another stated she could not remember this particular escape because there were so many escapes in the area. A third person remembered this escape because his wife had served on a jury case in March, but could not remember the names of the people involved or any other details. Three other persons had read about the escape and knew defendant was one of those involved. A seventh person heard about an escape, but did not know when it occurred or who was involved and had never heard of defendant. Another person's mother had told her that defendant had escaped and been caught, while four others did not know anything about this escape.
Most of those questioned believed defendant could get a fair trial and that they could serve as impartial jurors. Only one person was convinced defendant could not get a fair trial in Ouachita Parish, while two others were unsure and two more were not asked.
As to the connection of government officials with the release of the publicity, the news director of KNOE television testified that the sheriff's department notified him of defendant's capture, but could only assume the information about the original escape was received from that department. The news director of KNOE FM and AM radio testified that when he received information that the escaped prisoners were back in custody, he called the police and confirmed the story, but he could not remember whether the information about the original escape came from the police department.
*683 Thus, the nature and degree of pretrial publicity was not unusual, and the connection of government officials with the release of publicity was routine and minimal. The length of time between the dissemination of the publicity in early March, 1979 and the trial on October 22, 1979 was about seven months. The jury was to be drawn from Ouachita Parish, whose major city is Monroe.
The offense was not so severe as to attract substantial notoriety, and while the murder trial received considerable attention, the escape did not achieve the same notoriety. Most of the persons called had knowledge of the murder of which defendant was convicted, but knew little about the escape. For example, one had heard about the victim's death, but did not know about the trial or the fact that someone had received the death penalty for that crime. Another had heard about the murder on television, but knew nothing about the death sentence or the subsequent escape. A third person had forgotten about the murder until she received her subpoena to appear in this case, and upon inquiry about defendant remembered that an elderly lady had been killed with a skillet. Several others had read or heard about the murder, but most did not remember defendant's involvement.
The trial record does not reveal any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Only one witness had any difficulty with candor at the hearing, probably because she had been told of the murder by the woman who discovered the victim's body. However, at defense counsel's request defendant was excused from the courtroom during her testimony (defendant also stating that he wished to be excused), and this factor should not have affected the witness' candor or veracity. In fact, she emphatically stated her belief that defendant could not receive a fair trial on the escape issue in Ouachita Parish.
In summary there was not an unusual amount of publicity for this crime. Moreover, although nine of the 13 persons had heard about the escape, many did not know the details or that defendant was involved, and most either felt that they could be impartial jurors or that the defendant could get a fair trial in Ouachita Parish. On the basis of the evidence presented the trial court did not abuse its discretion in denying the motion for a change of venue.
Nevertheless, this conclusion does not completely dispose of the issue, since defendant also contended that he was prejudiced by the trial court's refusal of his offer of evidence of publicity disseminated prior to the murder trial.
The trial court had previously denied a motion for a change of venue prior to the murder trial, after an extensive hearing, and that denial was affirmed by this court on appeal. At the hearing on the present motion for change of venue the trial judge, noting that only three of the 25 to 30 persons called to testify at the hearing of the prior motion (in the murder case) believed the pretrial publicity about the murder would affect their decision in that case, ruled that evidence of pretrial publicity in connection with the murder trial (as opposed to evidence of publicity concerning the trial itself) was not relevant to the hearing on the motion for a change of venue in connection with the escape trial.
This court cannot agree that publicity surrounding the original offense for which a defendant was arrested is not relevant to a motion for a change of venue if the defendant is later charged with escaping from custody. Nevertheless, the record establishes that this defendant was afforded ample opportunity to offer evidence of events tending to create a cumulative effect in causing prejudice in the public mind. See State v. Felde, above at 1388.
In reviewing defendant's evidence offered in support of his motion for change of venue in the murder trial, this court stated that "the evidence at the hearing on the motion was that the newspaper coverage was routine for a murder case" and that "the lay witnesses at the hearing were generally unfamiliar with the crime although some had a sketchy impression about it *684 from the news media." Under these circumstances detailed evidence of the pre-murder trial publicity at this hearing, although relevant, would only have been repetitive and would have served no useful purpose. The extent of pretrial publicity on the simple escape charge was, of course, another matter and was thoroughly considered. Moreover, while the trial judge refused to review the newspaper articles and other documentary evidence connected with publicity prior to the murder trial, he allowed the witnesses at the hearing on the motion to testify in regard to their knowledge of the murder, as well as to their knowledge of the murder trial itself.
We conclude that the trial court's ruling on the introduction of evidence of publicity disseminated prior to the murder trial did not deprive defendant of an adequate opportunity to show that he could not obtain an impartial jury or a fair trial in Ouachita Parish in the escape trial.
Motion to Recuse
Defendant contends that the trial court erred in denying his motion to recuse the trial judge and in refusing to submit the motion to another judge for hearing. Defendant argues that the trial judge's bias, prejudice and hostility denied him a fair trial.
The principal defense at trial was justification, and counsel tried to establish that conditions in the Ouachita Parish jail led to defendant's escape. In support of his motion to recuse, defendant argues that the trial judge evidenced a strong disdain for this evidence and showed his hostility by arguing with counsel and by assisting the state in supplying objections to defendant's questions, even objecting himself to some questions.
The lead witness in counsel's attempt to lay the foundation for the defense of justification was Isaac Smith, defendant's cellmate at the time of the escape. When counsel questioned Smith about threats against defendant's safety, the state objected, and the court sustained the objection. Counsel then asked Smith about any acts of physical or mental abuse directed toward defendant. The state objected again, and the court removed the jury. After some discussion defense counsel stated that he would proceed with this line of testimony outside the presence of the jury.
Defense counsel then asked the last question again, and the court said, "you may object to these questions one by one", whereupon counsel objected to the court's remark. The prosecutor remarked that he was going to object anyway, since Smith had been removed from the Ouachita Parish jail five months before the escape and any threats during Smith's presence were too remote to be of value in proving justification. The judge, nevertheless, allowed defense counsel to continue. Smith then testified that defendant, a white man, had been put into an all-black cell so that other prisoners could beat him up. The court's observation that counsel could not introduce this type of testimony without laying a foundation led to an argument over the interpretation of State v. Boleyn, 328 So.2d 95 (La.1976) and State v. Jacobs, 371 So.2d 801 (La.1979). However, when counsel pointed out that this testimony would establish a history of futile complaints by the defendant, the court allowed him to continue.
Smith then testified that the jailer disliked defendant because of his wife, and the state objected. The judge remarked "it's calling for the opinion of the witness not for any facts". Defense counsel replied, "Is that the state's objection", to which the judge said, "that's the court's objection." Then defense counsel objected to the court's objecting for the state.
Smith also testified that they had asked the staff to move defendant because several inmates did not like him, that the staff would not let defendant receive items brought by his daughter, that the only way defendant received a radio was by having his daughter send it in Smith's name, that the staff switched letters defendant had written to his wife and to his girlfriend, and that defendant was afraid. The state objected to this testimony, but the trial court allowed defense counsel to continue, remarking:
*685 "I think we were somewhere out in left field but go ahead." Counsel and the court then engaged in the following exchange out of the presence of the jury, before counsel asked the judge to recuse himself:
"The Court: Do you know something. I'm going to require you, before we stay out in left field where I just now said we were, to establish some more direct evidence of a necessity for escape otherwise we're going to stay with somebody like this six months old. I've read the law to you and you're not following the law.
"Mr. Smith: Your Honor, I also have the law in front of me and it's our position we are
"The Court:  And I happen to be the Judge and I happen to have the final say and I'm telling you that you're not following the law.
"Mr. Smith: Your Honor, we're going to object to the Court's interpretation of State v. Boleyn. I cannot find anything in State v. Boleyn which says that the criteria has to be proved in perfect order so we would object to the Court's ruling and ask that the objection be noted.
"The Court: Let the objection be noted, and you are correct, Mr. Smith. I don't know why I'm arguing with you except I'm trying to save time. There's got to be some immediacy. You can't stay six months away from the escape.
"Mr. Smith: Your Honor, all I can do is object. We feel like we don't have to prove the immediacy before any particular
"The Court:  Well, why don't you prove-what I'm suggesting you do is prove the immediacy first.
"Mr. Smith: Your Honor, we would object but we will comply at this time
"The Court:  There's one thing I would like for you to prove and one thing I want to consider in this and that is what he did after he did escape from jail.
"Mr. Smith: Your Honor, we will prove that. We just haven't reached that point in this case yet.
"The Court: Well, why don't you do it first.
"Mr. Smith: Because we have a certain preparation of order of defense.
"The Court: We're going to be here for three days if we're
"Mr. Smith:  If it please the Court, we've already been here for three days but that's the state's fault, not mine.
"The Court: No. We haven't been here three days.
"Mr. Smith: Your Honor, at this time I'm going to make a formal motion. I believe this Court is evidencing animosity toward this defendant and this defense counsel in this case. I do not have a formal motion to recuse judge prepared but I will orally-will orally so move and ask for leave to prepare a written motion ...."
After counsel presented his formal motion, the court called a recess and ultimately denied the motion, without referring it to another judge, on the ground that no valid ground for recusation was set forth in the motion.
C.Cr.P. art. 671 provides the grounds for recusation of a judge as follows:
"In a criminal case a judge of any court, trial or appellate, shall be recused when he:
"(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial
* * * * * *
"(6) Would be unable for any other reason, to conduct a fair and impartial trial."
C.Cr.P. art. 674 also provides:
"A party desiring to recuse a trial judge shall file a written motion therefor assigning the ground for recusation. The motion shall be filed prior to commencement of the trial unless the party discovers the facts constituting the ground for recusation thereafter, in which event it shall be filed immediately after the *686 facts are discovered, but prior to verdict or judgment. If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion for hearing to another judge or to a judge ad hoc, as provided in Article 675."
In State v. Gordy, 380 So.2d 1347 (La. 1980) this court stated:
"The provision that a judge may be recused because of bias or prejudice was introduced in the Code of Criminal Procedure in order to further the policy that courts should avoid even the appearance of partiality. See the Official Revision Comment for C.Cr.P. 671. The bias or prejudice must be of a substantial nature, however. State v. Qualls, 377 So.2d 293 (La.1979); State v. Maduell, 326 So.2d 820 (La.1976); Official Revision Comment for C.Cr.P. 671. In State v. Lukefahr, 363 So.2d 661, 663 (La.1978), we stated:
`A motion to recuse a trial judge must be based on more than mere general conclusory allegations. State v. Bell, 346 So.2d 1090 (La.1977); State v. Maduell, 326 So.2d 820 (La.1976); State v. Collins, 288 So.2d 602 (La.1974). If the motion, on its face, does not show grounds to recuse even if the allegations are proved, the trial judge may overrule the motion without referring it to another judge. La.C.Cr.P. art. 674; State v. Bell and State v. Collins, cited above.'"
In the present case defendant made specific factual allegations to support his conclusion that the trial judge should be recused. The handwritten motion asserted that (1) the trial judge was unduly argumentative, (2) the judge commented on the evidence outside the presence of the jury, (3) the judge restricted counsel's presentation of his case by requiring him to lay a foundation for the defense of justification, (4) the judge did not rule on objections, motions, and arguments in an unbiased manner and supplied objections for the prosecution, and (5) the judge made comments which suggested to the prosecution objections which could be made.
Although specific, defendant's complaints relate more to the manner in which the trial judge conducted the proceedings than to evidence of bias or prejudice by the trial judge. These are the type of contentions which could have been properly raised by a motion for a mistrial or preserved for assignment of error by contemporaneous objection. See C.Cr.P. arts. 775 and 841. However, defendant would now have us rule that the trial court should have halted the proceedings and referred to another judge the complaints which in effect were objections to the manner in which the trial was being conducted.
Such a ruling would impose an undue burden on trial courts and would allow a defense counsel to derail the orderly course of a trial and have a second trial judge rule on the merits of his objections. In cases involving complaints about a trial judge's manner of conducting proceedings, this court can adequately protect a defendant's right to a fair and impartial trial by reviewing the record on appeal to determine whether the trial court became unduly argumentative, or improperly commented on the evidence, or improperly restricted counsel's prosecution of his case, or failed to rule properly and fairly on objections, or in effect assumed the role of prosecutor (by suggesting prosecution objections). These complaints do not require proof or consideration of matters not in the record, and this court is in a position to determine the merits of the trial-related complaints.
Here, there may have been some less than cordial exchanges between the trial court and defense counsel, but the record as a whole does not support defendant's contentions. While trial courts have a duty to remain impartial and neutral, judges are not merely umpires or moderators. They also have a duty to apply the law and assist in the search for truth. See Knapp v. Kinsey, 232 F.2d 458 (6th Cir. 1956); United States v. Marzano, 149 F.2d 923 (2nd Cir. 1945). As Judge Hand said in United States v. Marzano, above at 925:
"A judge is more than a moderator; he is charged to see that the law is properly *687 administered, and it is a duty which he can not discharge by remaining inert."
The record does not establish that the trial judge was prejudiced or that the defendant was denied a fair trial. Thus, there was no error in the denial of the motion to recuse, which we have treated as a motion for mistrial, or in the court's failure to submit the motion to another judge for hearing.
Defense of Justification or Necessity
Contending that his escape was justified, defendant argues that the trial court erred in refusing to allow him to question witnesses as to conditions in the Ouachita Parish jail prior to his escape. Defendant further contends that the guidelines established in Louisiana for the defense of justification are unduly restrictive and infringe upon his constitutional rights.
Presentation of the defense of justification began with the testimony of Isaac Smith. Midway into his testimony the trial court dismissed the jury and conducted a hearing on the question of whether the counsel could press forward with the defense of justification. Evidence adduced at that hearing revealed various complaints by defendant concerning the conditions under which he was incarcerated.
Isaac Smith, defendant's cellmate from October, 1977 to November, 1978, testified, in addition to the testimony previously discussed, that the jailer would not give defendant medicine for his rash or his nerves, that he heard two jailers threaten defendant, and that defendant said he was trying to get moved to Angola or to another cell so that he would be safe.
Rodney Eaker, who had been incarcerated in Ouachita Parish jail since March 30, 1978, was in defendant's cellblock prior to the escape. Eaker corroborated Smith's testimony in many respects, asserting it was "common knowledge" in the jail that the jailers disliked defendant and that defendant had told him about threats on his life. Although Eaker never knew defendant to complain about this abuse to any official higher than a jailer, he stated that the only way a prisoner could get help was to call out in a voice loud enough for the jailers to hear them over the intercom. Eaker also testified that defendant had a severe rash, swollen gums, bleeding ears and severe headaches, and that when defendant would ask for help, some jailers would laugh and do nothing, while other jailers would seek aid for him.
Marlin Mikesell, who lived in defendant's cellblock from January, 1979 to March 4, 1979, stated that other inmates threatened defendant because of disputes with him and that defendant said the police had also threatened him. Mikesell also stated that the jailers would not help defendant when he asked for medicine or to see a doctor.
The assistant director of the North Louisiana Legal Assistance Corporation, who had filed on suit on behalf of the Ouachita Parish jail prisoners in federal court and had visited the jail numerous times in connection with that litigation, was also called to testify, but most of the questions directed to him were objected to and excluded on the basis of vagueness or irrelevance to the defense of necessity.
This court has recognized the special defense of medical necessity in escape cases. See State v. Jacobs, above. However, even if defendant proved he was denied medical attention while in the Ouachita Parish jail, he did not establish the other conditions for application of the defense, as set forth in the Jacobs case.
There was no evidence to show that defendant informed the prison officials in writing of his physical condition, that his physical condition was serious, that he did not have time to resort to the courts, that he sought medical treatment after his escape or that he thereafter surrendered himself to the authorities.
This court has also recognized the defense of justification for an escape when an inmate is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future. See State v. Boleyn, above.
*688 In the present case, however, the time of the alleged threats against defendant was never stated. Although there was some evidence to support the fact that he had complained without result to the authorities, defendant did not resort to the courts. Moreover, while defendant did not hurt anyone in the escape, on the other hand he did not report to the proper authorities when he attained a position of safety. See United States v. Bailey, 394 U.S. 444, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980).
These rigid limitations on the defense of justification have been imposed by the court in order to ensure that the prison administration and the courts remain the normal channel for a meritorious complaint. State v. Jacobs, above. These requirements protect against assertions by those prisoners who would endanger prison life and public safety by escaping and then fabricate charges of inhuman treatment or neglect as an afterthought to their flight from justice. The offer of proof in this case was simply insufficient to establish the defense of necessity or justification, and the trial judge was correct in excluding this evidence.[3]
DECREE
For the foregoing reasons the conviction and sentence are affirmed.[4]
NOTES
[1] That conviction has now been affirmed by this Court. State v. Baldwin, 388 So.2d 664 (1980).
[2] This sort of "try me" voir dire has been found useful in other cases. See State v. Bell, above.
[3] For the same reasons the trial court properly denied defendant's requested special instructions on the defense of necessity. Furthermore, the requested instructions were not "wholly correct and pertinent", C.Cr.P. art. 807, and they did require "qualification, limitation, [and] explanation", C.Cr.P. art. 807.
[4] The court has considered defendant's other assignments of error and for the reasons stated in the attached unpublished appendix has found them to be without merit.