MAX N. TOBIAS, JR., Judge.
hOn 13 June 2013, the state'indicted Anthony “Midnight” King (“King” or “the defendant”) for the 27 February 2013’ second degree murder of Jerry “Boogie” *268 Hooker (“the victim”)) a violation of La. R.S. 14:30.1. King entered a plea of not guilty at his 19 June 2013 arraignment. His motions to suppress statemént and evidence were denied. King’s case was tried 28-30 April 2015 and a jury returned a unanimous verdict of guilty as charged. On 11 June 2015, the court sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, with credit for time served. This timely appeal followed.
L
A. The State’s Case

Testimony of Michelle Johnson

Michelle Johnson testified that she was a complaint operator with the New Orleans Police Department (“NOPD”) Communication Division, and her job entailed receiving ,911-calls and generating recall incidents and audio tapes of the calls. Ms. Johnson explained that when a 911-call is received, it is assigned an item number for identification. She identified exhibits as the incident recall and 12audio recording of the 911-call relative to this case. The recording was played for the jury.
Testimony of Lisa Makell[1]
Lisa Makell, the victim’s mother, testified that on 22 February 2013, she received a call at work telling her that her son was dead. Ms. Makell identified an exhibit as a photograph of her son, who was twenty-one years old at the time of his death.
On the day the victim died, Ms. Makell spoke with Detective Jeffrey Vappie and identified “Bree” and “Flo” as two of the victim’s friends. She did not know King prior to her son’s death.

Testimony of Dr. Michael DeFatta

[2]

Dr. Michael DeFatta, the state’s expert in forensic pathology, performed an autopsy on the victim’s body and rendered a report of his findings. Dr. .DeFatta retrieved three bullets from the victim’s body and classified the death as a homicide. He found that the victim sustained six gunshot wounds — three to the head, two of which were fatal; one lethal wound to the chest; one shot to the arm; and a sixth to the lower back, also fatal. He concluded that all of the bullets were fired from a range of 36 to 43 inches from the victim.
Testimony of Detective Timothy Bender[3]
Detective Timothy Bender assisted in the investigation of the subject shooting in the 800 block' of Belleville Street in New Orleans.. The crime scene was already cordoned off when he arrived, and he documented the description of the scene — a residential area, with abandoned properties, vacant lots, and some Rcommercial businesses. The detective observed the victim’s body on the front porch of 827-829 Belleville Street. He identified a state’s exhibit as a series of photographs taken of the crime scene. He noted 9-millimeter bullet casings were retrieved at the shooting scene, but no weapon was recovered.

Testimony of Sergeant Mark Boudreau

Firearms examiner Sergeant Mark Bou-dreau testified he examined bullets retrieved during the victim’s autopsy — 9-millimeter caliber bullets. Sergeant Bou-dreau concluded only one weapon was used to shoot the victim, and it was a 9-millimeter- semi-automatic firearm-.

*269
Testimony of Javon Tapp

Javon Tapp (“Javon” or “Mr. Tapp”) testified that he grew up in Algiers near the 800 block of Belleville Street. Javon said people often hung out at' 827-829 Belleville Street, an abandoned residence, that was approximately three blocks from his residence. On 27 February 2018 at about 5:00 p.m., he and his friend, Dwayne, were purchasing candy at the house next to the 827-829 Belleville Street location. While several people were present at 827-829 Belleville Street that day, he did not recognize anyone.
Initially, Javon denied arguing with and being slapped by anyone on the day of,the shooting, but eventually ádmitted telling Detective Vappie someone had slapped him. As Javon and Dwayne .were returning to Javon’s residence, they heard gunshots, but did not see the actual shooting. He said he knew the victim from his neighborhood though he did not see him on the day of the shooting.
A couple of weeks after the- shooting, when Javon arrived at school, he reported to school personnel that he was being followed by some men in a green Rear, who asked him if he “was from the block.” School personnel called the police, and Ja-von and his mother spoke to the police at school and then accompanied a detective to police headquarters to give a statement. Javon said his mother told the police that King slapped him just prior to the shooting.
Javon said that when he spoke privately with Detective Vappie, he made up the story about being slapped. He claimed the detective yelled at him to tell the truth during the recorded statement. He then testified that he did not remember the story he made up.' The prosecutor played a portion of Javon’s taped statement, and he acknowledged that it was' his voice on the tape.
On cross-examination, Javon indicated that Detective Vappie tried to get him to say he saw King with a gun on the day of the shooting. He also said that the detective wanted him to say that he was at 827-829 Belleville Street at the time of the shooting, although he asserted he was not. He denied telling Detective Vappie that King threatened to kill him,.and said he made up that story because of pressure exerted by the detective.
On re-direct, Javon said that Detective Vappie forced him to say the things contained in his recorded statement. .He also said that everything his mother told the detective about King slapping him was incorrect and that same was nothing more than the “word on the street.”. He denied remembering anything he told the prosecutors and claimed his statement was not replayed for him.
Testimony of Detective Jeffrey Vappie[4]
Detective Jeffrey Vappie, the lead detective on this, case, testified that when he arrived, at the, crime scene, he assigned various investigative tasks — scene description and photos, canvassing for witness, et cetera — to members-, of his |¿homicide team. He received information that a weapon had been allegedly discarded in a vacant lot or an abandoned residence near the shooting scene. Bullet casings were collected from the scene, and a bag was recovered from the porch where the victim’s body was found. No witnesses, except the- victim’s mother, came forward to speak with police on the night of the shooting. ..
*270 On the morning after the shooting, Lieutenant Doug Eckert assisted in identifying possible witnesses developed during Detective Vappie’s investigation. “Tapp” was identified as Javon Tapp; however, police were unable to establish the identities of “Pluck” and “Dooka.” Sometime later, Detective Vappie received Kang’s name as a suspect. He explained that he received a call from the resource officer at Javon’s school concerning an issue or incident involving Javon and King. Javon’s mother, Mrs. Tapp, spoke with school personnel and him. She accompanied Javon to the homicide office to be interviewed, where the detective spoke with Javon in the presence of his mother, who was extremely concerned for his safety. Mrs. Tapp said her son was the one who had told her about the shooting, and for that reason, she could not understand Javon’s reluctance to speak to the police.
At no time did Detective Vappie mention King’s name to Javon or his mother. Contrary to Javon’s trial testimony, his mother was present during the entirety of his two statements to the detective.
Detective Vappie confirmed Javon was reluctant to get involved, exhibiting a detached demeanor, as though he did not appreciate that his safety was in jeopardy. Detective Vappie related that this shooting stemmed fi-om ari altercation between Ja-von and King. Mrs. Tapp became very agitated/frustrated with her son Rfor not providing the information he had concerning the shooting. Throughout the interview, Javon attempted to ignore/dodge the questions posed by Detective Vappie. Because of Mrs. Tapp’s increasing agitation with her son, Detective Vappie interrupted the interview and stepped out of the room to console her, after which she and the detective,rejoined Javon and the recorded interview, resumed. Javon’s demeanor, however, was still uncooperative, but he did admit that he was involved in a. slapping incident on the day of the shooting.
Mrs. Tapp supplied Detective Vappie with King’s name as a suspect in this shooting. No other suspects were developed in this case, and none of the information the detective received in this case indicated that the shooting was gang-related.
Détective Vappie further testified. that an anonymous caller led him to a Mr. Baakir Tyehimba, the owner of the coffee shop in the 800 block of Belleville Street. The detective told Mr. Tyehimba that he was seeking'information about the subject shooting but did not mention King’s name to him. Mr. Tyehimba did not want to get involved. ■ Nevertheless, Mr. Tyehimba gave Detective Vappie a physical description of King, and said'that King and Javon were arguing at the time of the shooting. Mr,. Tyehimba identified the defendant from a picture, displayed to him. 'A few days later, Mr. Tyehimba gave .a taped statement, during which he told the detective that he was not certain of the information he had originally given. At no time did Mr. Tyehimba identify King as the shooter; rather, he said he was familiar with King and that the victim and King were arguing at the time of the shooting.
|7Further along in' the investigation, the victim’s mother gave Detective Vappie the name of Brione “Bree” Hawkins,[5] who met with Detective Vappie at the homicide office. She said she was frightened by what she witnessed and also told the detective that Christopher Brisco was present on the porch at the time the victim was shot. *271 Detective Vappie did not tell Ms. Hawkins that King was a suspect in this shooting.
Detective Bender participated in Ms. Hawkins’ interview by conducting a double blind photographic lineup from which she identified King as the shooter. Thereafter, Detective Vappie prepared a warrant for King’s arrest.
Detective Vappie eventually located Christopher Brisco, but Mr. Brisco refused to speak with the police. Because he was never able to establish an address • for King, Detective Vappie did not prepare a search warrant' for King’s residence. Later, however, the detective established that King at one time lived two blocks from the shooting scene.
Detective Vappie interviewed King but was unable to verify that he was where he said he was at the time of the shooting.
Under cross-examination, the detective acknowledged that the murder ’weapon was never found. He also said no physical evidence existed linking King to the shooting. He said he told Ms. Hawkins that he knew that the green bag found next to the victim’s body belonged to her.

Testimony of Baakir Tyehimba

Baakir Tyehimba testified that he owned a coffee shop in Algiers at the corner of Belleville and Slidell Streets.. He had lived in Algiers his .entire life and |Rwas familiar with his neighbors and the neighborhood. Mr. Tyehimba recalled that the house where the shooting occurred was vacant at that time, but people “hung out” there. Some of the people who frequented the 800 block of Belleville Street were “Joe,”. “Puppy,” “Flo,” Chris (Christopher Brisco), “Jonathan,” “Dooka,” “Pluck,” “Peter,” “Midnight” (King), “Little Bree” (Brione Hawkins) and her friend “Boogie” (the victim). Mr. Tyehimba knew. King through community workshops.
On the day of the shooting, Mr. Tyehim-ba was fixing the license plate on his daughter’s car when he heard cursing and arguing. After stepping inside his shop, he heard a couple of gunshots. As he opened the front door, he heard three more shots and screaming followed by people, including Ms. Hawkins and Jonathan, running from the shooting scene. Prior to the shooting, Mr. Tyehimba looked in. the direction where, the arguing was coming from and observed King on the porch where the victim was shot, but he did not actually see the shooting.
' Mr. Tyehimba made an in-court identification of King.
About five days after the shooting, Mr. Tyehimba gave Detective Vappie a description of King, noting in particular a tattoo — a Star of David — on King’s face. Mr. Tyehimba identified King from a license identification card supplied by the detective.
On 30 May 2013, Mr. Tyehimba-gave the detective a recorded statement at his coffee shop, which was consistent with his discussion he had with the detective five days after- the shooting:1 Mr. Tyehimba denied seeing a gray Pontiac speed off after the shooting. He recalled giving a statement to the defense shortly after the |9shooting, but he could not remember if he gave that statement between the two occasions he spoke to Detective Vappie.

Testimony of Brione Hawkins

Brione -Hawkins testified on behalf of the state and said that she was familiar with the 800 block of Belleville Street because she lived in that neighborhood at the time of the shooting. Ms. Hawkins described the victim as her best friend, and she said they hung out together every day, primarily at 827 Belleville Street, which was vacant and frequented hy people, including King, partying and selling drugs. *272 Ms. Háwkins knew “Moonie” (Sheneka[6] Patín) to hang out regularly at that address. She also stated she saw King kill the victim.
On the day of the shooting, Ms. Hawkins and the victim were conversing with friends in the 800 block of Belleville Street. As they sat on the porch of the 827 Belle-ville Street property, Javon and another young male arrived and started talking to “Dooka” about a gun being stolen. The defendant arrived at 827 Belleville ■ Street in a vehicle driven by a female. King was cordial to the victim and the others on the porch; however, a few moments later, King got into an argument with Javon, slapped him, and told him to leave the area. King then announced that he had a 9-millimeter gun. He walked across the street, retrieved the firearm from a rear yard, and returned to the group armed with the weapon. In the meantime, Javon, who was unarmed, ran away. King then ordered Ms. Hawkins and the victim to leave. When the victim refused, King shot him several times. Ms. Hawkins said she was a just a few feet from the victim when he was shot. After the shooting stopped, Ms. Hawkins ran to the victim’s house, a block Imfrom .the; shooting scene, but no one was home. When Ms. Hawkins heard police sirens, she left the neighborhood.
A few days after the shooting, the victim’s mother spoke- to Brione Hawkins’ mother, asking that Brione speak to the police about the shooting. Brione met with and gave a recorded statement to Detective Vappie in which she identified King as the man she saw shoot thé victim. At the conclusion of the statement, Brione identified King from a photographic lineup presented to her by Detective Bender. After Brione was incarcerated on an unrelated charge, she spoke with defense counsel and told him the same thing to which she had then just testified. Brione said she considered King a friend until he shot the victim. She identified King in court as the man she saw shoot the victim.

Testimony of Sheneka Patín

The next state’s witness was Ms. Shene-ka Patín, who initially refused to be sworn in and refused to answer questions posed by the state. After a brief conference with her attorney (Amanda Fraser), Ms. Patín was sworn in and testified that she had criminal convictions — drugs, theft of a car — but said she could not recall the sentences she received for those convictions. She did not want to testify in this matter because she feared for her safety. Ms. Patín told the jury that on the day of the shooting, she was at a House across the street from 827 Belleville Street. She recalled that Brione Hawkins, Javon, and the defendant were present at 827 Belleville Street, talking, rapping, and generally getting along with one another. Javon and King had an argument, and Javon left the area. She said she did not see King shoot the victim and denied having told the prosecutors earlier that he killed.the victim. After repeated attempts by the prosecutor to elicit additional information from her, Ms. Patín admitted she saw King shoot the victim |;1 and had previously told the prosecutor she saw the- shooting. Further, she said that during the argument with Javon, King slapped Javon, and Javon- left the area. She watched as King went to a house across the street and then returned to 827 Belleville Street armed with a 9-millimeter weapon. She witnessed King shoot the unarmed victim and then flee.
Under cross-examination, Ms. Patín admitted pleading guilty to two drug offenses and serving five years on probation. She *273 admitted she was a quadruple offender and presently incarcerated on a charge of armed robbery that occurred after this shooting. She also acknowledged that if convicted of the armed robbery, she could be sentenced to ninety-nine years imprisonment.
On re-direct examination, Ms. Patín denied being threatened or offered anything in exchange for her testimony in this case.
Defense counsel then examined Ms. Pa-tin extensively on her past convictions and pending armed robbery charge.

Testimony of Officer Brian Sullivan

NOPD Officer Brian Sullivan testified that he was one of the first officers on the shooting scene, which he secured; he then requested medical aid for the victim and searched for ballistics evidence. He spoke to one of the few people on the scene, witness Sheneka “Moonie” Patín, who told him she witnessed the shooting. Officer Sullivan gave the homicide detectives Ms. Patin’s contact information.
B. The Defense’s Case

Testimony of Officer Tameka Anderson

The first defense witness, NOPD Officer Tameka Anderson, testified that' she investigated the 18 March 2013 murder of Norman Brisco. The shooting | ^occurred in the 800 block of Elmira Street in a bedroom Norman shared with his brother, Christopher Brisco.

Testimony Detective Matthew Morrison'

■ Detective Matthew Morrison testified that he played a limited part in the investigation in this case, noting that the 800 block of Belleville Street was known as the “hot block.” He said there were two gangs from the Fisher Housing Projects— the Fisher Fools and the Casino Boys— who were feuding with the guys in the “hot block.”
Continuing, Detective Morrison said he was the lead detective in the 30 January 2013 shooting death of Sens Tyler at the intersection of Belleville and Opelousas Streets. Detective Morrison’s investigation led him to believe that the killer was driving a silver/gray Pontiac and came from the Fisher Project. The detective confirmed that none1 of the people at the shooting in this case was connected to the death of Norman Brisco.

Testimony of Officer Gina Cousin

NOPD Officer Gina Cousin responded to a shooting at Newton and Thayer Streets on 25 January 2013. The victim of that shooting was wounded in his arm and leg. Investigation of .that crime indicated that a silver/gray Pontiac Grand Prix was involved.

Testimony of Officer Latrell Washington

Officer Latrell Washington investigated the 25 January 2012 shooting of Florian Franklin in the 1100 block of Newton Street. The shooters in that case were driving a silver/gray Pontiac. Officer Washington said there was nothing to indicate that the Franklin shooting' and the shooting in this case were related.
C. The State’s Rebuttal Case

11BTestimony of Detective Joseph Jefferson

In rebuttal, the state called Detective Joseph Jefferson, who was the lead detective in the murder of Norman Brisco. Detective Jefferson spoke with Detective Vappie about this shooting and learned that Detective Vappie knew Christopher Brisco was Norman Brisco’s brother, and that Christopher Brisco and King were friends. Detective Vappie also knew that Christopher Brisco was a possible witness in this case and wanted to talk with him. To that end, Detective Jefferson allowed Detective Vappie to accompany him to speak with Christopher Brisco. Detective *274 Jefferson did not find any evidence that the Brisco homicide and the shooting in this case were related. -
II.
ERRORS PATENT
A review for errors patent on the face of the record reveals none.
III.
ASSIGNMENTS OF ERROR

ASSIGNMENT OF ERROR NUMBER 1

In his first assigned error, King asserts that he was denied effective assistance of counsel. He alleges a conflict of interest because his trial attorney was appointed previously to represent state’s witness, Sheneka “Moonie” Patin, on revocation of probation charges. King maintains that this conflict of interest negatively impacted his counsel’s effective cross-examination of Ms. Patin during this trial.
In State v. George, 12-0204 (La.App. 4 Cir. 1/9/13), 108 So.3d 269, citing State v. Salinas, 97-716, pp. 8-9 (La.App. 3 Cir. 10/29/97), 703 So.2d 671, 676,[7] this court noted:
... “multiple representation is not per se illegal and does not violate the Sixth Amendment to the United States Constitution or Article I, [§ 13], of the Louisiana Constitution unless it gives rise to a conflict of interest.” State v. Kahey, 436 So.2d 475, 484 (La.1983). Where there has been no objection to the multiple representation prior to or during trial, the defendant must “establish that an actual conflict of interest adversely affected his counsel’s performance” in order to establish a claim of ineffective assistance of counsel in violation of the Sixth Amendment. State v. Lobato, 621 So.2d 103 (La.App. 2 Cir.1993). The mere “possibility” of conflict is insufficient to impugn a criminal conviction; the defendant must show that his counsel actively represented conflicting interests. Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).
“Frequently, the issue of conflicting loyalties usually arises in the context of joint representation, but “can also arise where an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant, and who was or is a client of the. attorney.” State v. Tart, 93-0772, p. 20 (La.2/9/96), 672 So.2d 116, 125, citing State v. Kirkpatrick, 443 So.2d 546, 552 (La.1983).
■ Our jurisprudence is well-settled that the mere possibility of a conflict is insufficient to establish that an attorney’s performance was adversely affected. See State v. Holmes, 99-0898 (La.App. 4 Cir. 11/8/00), 791 So.2d 669; State v. Ross, 410 So.2d 1388 (La.1982); State v. Franklin, 400 So.2d 616, 620 (La.1981). This court noted in Holmes that a defendant must prove both an actual conflict of interest and prejudice in order to establish a claim of ineffective assistance of | ^counsel. Holmes, 99-0898, p. 10, 791 So.2d at 682. An actual conflict exists if the defense attorney owes duties to a party whose interests are adverse to those of the defendant. Id. Actual conflicts of interest that affect counsel’s performance must be established by specific instances in the record, and the mere possibility of divided loyalties is insufficient proof of actual conflict. Id., p. 26, 791 So.2d at 691-692, citing State v. Lobato, 621 So.2d 103 (La. App. 2nd Cir.1993). The burden of proving an “actual conflict of interest,” rather *275 than a “mere possibility of conflict,” rests upon the defendant. State v. Carter, 10-0614, p. 7 (La.1/24/12), 84 So.3d 499, 510.
In State v. Cisco, 01-2732, p. 18 (La.12/3/03), 861 So.2d 118, 130, the Court defined an “actual conflict” as follows:
If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to the other client.
As in this case, “if the objection is made to the claimed conflict after trial, the defendant must also, show he was actually prejudiced.” Id., 01-2732, p. 17, 861 So.2d at 130 n. 18, (emphasis supplied); State v. Montegut, 618 So.2d 883, 888 (La. App. 4th Cir.1993) (if the defendant fails to raise the issue until after trial, he must prove prejudice in addition to an actual conflict of interest). Thus, if the issue of counsel’s alleged conflict of interest is not raised until after trial, “the defendant must prove that an actual conflict of interest adversely affected his lawyer’s performance.” State v. Reeves, 06-2419, p. 79 (La.5/5/09), 11 So.3d 1031, 1082 (citations omitted); Carter, 10-0614, p. 41, 84 So.3d at 509 n. 3 (citations omitted).
lifiThe failure of the trial court to inquire into the joint representation on the record does not rise to the level of a denial of a constitutional right and is subject to a harmless error review. State v. Miller, 00-0218, p. 14 (La.App. 4 Cir. 7/25/01), 792 So.2d 104,115 n. 4; Holmes, 99-0898, at p. 7, 791 So.2d at 694 (on rehearing).
In this case, the record does not reveal any instance where King’s counsel was burdened with a conflict of interest or his counsel’s performance was adversely affected by his representation. King claims defense counsel’s cross-examination was curtailed by. the conflict, and had counsel been able to aggressively cross-examine Ms. Patin, her bias in seeking a lesser sentence on the armed robbery charge and/or leniency in the revocation proceedings would have been revealed to the jury.
The record disproves this assertion. Defense counsel' cross-examined Ms. Patin extensively. She exhibited no hesitancy during her questioning. Defense counsel did in fact question Ms. Patin about her currently being on probation on a prior drug convictioh, that a revocation hearing was pending, and that new charges' were pending against her. Counsel elicited all the information about Ms. Patin’s criminal charges and about the revocation hearing she was allowed to under the law. Moreover, Ms. Patin categorically denied being offered any deals or consideration in exchange for her testimony.
Thus, King has failed to carry his burden of proving an actual conflict of interest and that that conflict adversely affected his counsel’s performance.
However, even if.a conflict had existed, it would be subject to a harmless error analysis. - An error is, harmless if “the verdict actually rendered was surely unattributable to the error.” State v. Mark, 13-1110, p. 18 (La.App. 4 .Cir. 7/30/14), 146 So.3d 886,: 900, citing State v. Johnson, 94-1379, p. 18 (La.11/27/95), 664 l17So.2d 94, 102. The verdict in this case was unattributable to a conflict of interest. The testimony of Ms. Hawkins and Ms. Patin determined the verdict in this case by their testimony that they witnessed King shoot and kill the victim. This assignment is meritless.
In a motion to supplement, defense counsel requested that the record in this matter be supplemented with docket *276 masters from Orleans Criminal District Court. Those docket masters document the charges brought by the state against Sheneka “Moonie” Patin and the fact Jill Pasquarella represented Ms. Patin on those charges. However, because the issue was not raised at trial, and the record does not reflect that'the trial court was apprised of the issue, this court cannot consider the motion to supplement.

ASSIGNMENT OF ERROR NUMBER %

In a second assignment of error, King claims that the trial judge made disparaging remarks to, and unfair criticism of, defense counsel, which prejudiced the jury against him and deprived him of a fair trial.
During a jury trial, the judge has a duty to remain neutral and impartial, while administering the law through rulings on evidence and charging the jury as to the applicable law. State v. Baldwin, 388 So.2d 679, 686-687 (La.1980). “A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert.” United States v. Marzano, 149 F.2d 923, 925 (2 Cir.1945); see also Baldwin, 888 So.2d at 686-687. In the discharge of judicial duties, the judge cannot comment upon the facts of the case in the presence of the jury, either by commenting on evidence or testimony or by giving an opinion as to what has been presented, proved, or' not proved. La. C.Cr.P. art. 772.
| iSIf, during trial, a defendant believes that the trial court commented improperly on the evidence, or made prejudicial comments in the presence of the jury, then the defendant must object at the tirhe of the occurrence or move for a mistrial. Baldwin, 388 So.2d at 686; La. C.Cr.P. arts. 770 and 775. A motion for mistrial or a contemporaneous objection to the alleged prejudicial comments or judicial bias preserves the issue for review on appeal. La. C.Cr.P. art. 841. See State v. Ellwest Stereo Theatres, Inc., 412 So.2d 594, 597 (La.1982).
An appellate court reviews’ claims of prejudicial comments or bias under a harmless error analysis. See State v. Diggins, 12-0015 (La.App. 4 Cir. 10/23/13), 126 So.3d 770.
To constitute reversible error, the effect of the improper comments must be such as to have contributed to the verdict, thereby denying the defendant a fair trial. Id., 12-0015, p. 14, 126 So.3d at 784. However, if the guilty verdict actually rendered was surely unattributable to the trial court error, then the error is harmless. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Harmless error review looks ... to the basis on which “the jury actually rested its verdict.” Yates v. Evatt, 500 U.S. 391, 404, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991).
The trial court has a duty to maintain control over the questioning of witnesses and presentation of evidence to the jury. State v. Jones, 593 So.2d 802, 804 (La.App. 4th Cir.1992). This court noted that a trial judge has the responsibility to exercise control over the nature of the questions posed by counsel to ensure fairness and judicial economy. An unavoidable risk of this duty is that in the heat of a trial, adverse rulings may incorrectly appear to reflect the judge’s opinion of a party, witness, or theory of the case. Experienced trial lawyers aware of this risk weigh seriously these concerns in phrasing questions to a witness. 11flThus, the risk exerts a moderating influence on the excesses of advocacy. Id., 593 So.2d at 804.
*277 In this case, the defendant cites in his brief twenty alleged prejudicial comments or disparaging remarks by the trial court and includes his interpretation of the comments cited:
• During cross-examination of Brione Hawkins about her motivation to testify when she had not stayed on the scene or made a statement at the time, the defense asked her questions about her criminal record and whether she wanted to be in jail. The state objected to relevance and that it was asked and answered. The judge remarked, “And under Rule 611, I have cóntrol of the court and I’m not going to allow you to badger a witness, which is what I believe. 'You are making her feel very uncomfortable and it’s a form of badgering but you can continue.”
• During cross examination of Brione Hawkins about drug sales and activity at the abandoned house on Belleville Street, the staté’s objection that it was argumentative and irrelevant, brought the judge’s reaction, “Sustained. Again, I’m going to assert the authority under Code of Evidence Rule 611, and as you, please stop trying to harass the witness.”
• Ms. Hawkins was allowed to testify about an alleged incident at her job in November or December of 2014 with an anonymous person who made a threat that she should “not come around there no more.”
• A fearful mood was set when the state called Sheneka Patín, who initially refused to take an oath or answer questions. A bench conference with Ms. Pa-tin’s attorney was held, after which the judge said: “And so I am going to advise you that I am — I will ensure any witness’ safety while on the stand in this courtroom. Okay? That’s all I -can do. All right? That means nobody will be making any signs, symbols, or anything of that sort to any witness in this courtroom; whether it be [the defendant], any member of the jury, or any witness, or any court staff, or any attorney. And that is the purpose of the deputies with the Orleans Parish Criminal Sheriffs office being .present.”
The defense objected and later made a motion for new trial for the comment. .After the judge!s statement, Ms. Patín then denied having any knowledge of the incident. After being reminded of , statements to the District Attorney and police, she then implicated King.
While ruling on the motion for new trial, the judge admitted that she had not seen anything going1 on in the court- • room or the audience , that raised a . concern and no one made a complaint to her of any wrong doing.
120* During cross • examination of Brione Hawkins .about her gang activity, which she had denied until confronted with photos of her flashing gang signs, the state’s objection of asked and answered. was .sustained and then the judge commented, ‘You are being repetitive. Again, under rule 611, I’m going to tell you to move on so we can avoid needless consumption of time.” Now the judge was . telling counsel that the defense was a waste of time.
• During cross examination of Detec-five Jeffrey Vappie, the state objected to the form of one question. The judge called a bench conference that was not transcribed, after which the judge said to -the jury, implying that the defense questions were-improper: “So I. have asked defense counsel to stop providing the witness with the answer and then saying ‘right.’ I have asked that a question be formulated for each and every witness that she wishes to question.” This- diverted the jury’s focus from what *278 is being said and to how it is being asked.
Throughout the testimony of Mr. [Ja-von] Tapp, and in portions- of the direct questioning of Mr. Tyehimba, Brione Hawkins, and Sheneka Patin’s testimony, the state used the same forms of questions without any reprimand, comment or intervention by the judge.
Without any objection from the state, the judge continued objecting to the defense asking leading questions in this form, even during cross-examination. The judge accused the defense : of “giving him the answers” and criticized, “Try to formulate it better than you are doing.”
Without an objection from the state or a complaint from the witness, the judge told the defense attorney, “I will keep correcting you.” And the judge continued the interruptions. When the defense attorney objected that the questions were proper for cross-examination, the judge reprimanded again. The judge had a bench conference and thereafter the defense attorney stopped cross-examination.
• Javon, who was incarcerated during trial and who denied or recanted his alleged prior statements, had his attorney present during his testimony; The attorney raised a Fifth Amendment objection in attempting to invoke his privilege, the judge responded that “he does not have a Fifth Amendment right.” Javon, who was at risk of perjury or obstruction charges, had a Fifth Amendment right not to answer incriminating questions.
• When Javon was not saying what the prosecutor wanted and recanted his pri- or statement, the state wanted :to play “the entirety of his made up statement” in place of his testimony. The defense objected that it was not for impeachment or to refresh his memory and playing the tape was improper and irrelevant.
In response to the defense’s objection, the following exchange ensued;
[^Defense: It doesn’t appear that they are impeaching him. So I don’t know what the basis is for playing the statement. He is on the stand, they can just ask him questions.
Prosecutor: Well actually, he has -testified that this whole story is made up so we would like to get the opportunity to listen to the entirety of his made up story to then try and figure out what exactly is going on with Mr. Tapp. He has already testified that he did, one, he did give a statement.. Two, that his mother forced him to give a statement and that was based on the fact that his mother was hearing things on the street. So, that’s why he gave a statement and now he is saying he is making up a statement. So because of that, we do believe that we should be.able to play the entirety .of at least the story that he gives,
Defense; ... it is irrelevant and - its improper impeachment.
Judge: I don’t think it is irrelevant.
Prosecutor: And Judge, if you are going off what Mr. Tapp just said that he says he didn’t recall the statement, I certainly think we should be able to play the statement to refresh his memory about what he said.
Judge: Sure. On those grounds I’m going to allow it over the defense’s objection.
Defense: I’m sorry Judge. I would .also object on hearsay grounds.
Judge: . -.. overruled. It is my understanding that State is about to play *279 the statement that this defendant [sic] says he made but he doesn’t recall.
• The judge sustained the objection to inappropriate leading questions during direct examination about what. Javon’s mother,heard on the streets that motivated her to bring him to the police, but then allowed the questioning, finding that “And that’s why she brought you in or wantéd you to talk to the police officers and cooperate with them, correct” was different from “And that’s why she brought you to the station?”
• The state withheld- Javon’s statements from the defense until the trial began, then asked Jávon in direct examination whether the defense played the tape for him during their pre-trial meeting, which they [sic] knew was impossible. When the defense objected to the state’s mischaracterizing the situation and implied that the defense did something wrong or withheld information, the judge said, “Well, that doesn’t sound like a ground. Well, I guess they [sic] have no ground.” The judge overruled- an additional objection that the question was improper.
• The direct examination of Detective Jeffrey Vappie regarding post arrest questioning of King, showed the prosecutor was asking all leading questions, and the defense’s two level objections, both on hearsay and privilege grounds, were overruled. Although King told the officer that he was not at the scene but was uptown on the day of the incident, the state asked whether he provided -an explanation for how the homicide occurred 122and whether he said there was a drive-by shooting that day, information he could not provide if he were not present.[8]
• Without objection by the state or a complaint by the witness, the judge intervened in the questioning of Detective Vappie. The judge directed the defense attorney to ask a question and then complained that the question “was the longest question I’ve ever heard” and directed the defense to .ask a question that was not so lengthy and ambiguous.
• After direct testimony of Mr. Tye-himba, the state tendered the witness. The judge had the attorneys approach the bench, prompting the state of ask the witness additional, objectionable questions about his meeting with the defense attorneys. The defense objections to relevance were overruled. Then the state insinuated that the defense meeting occurred before Mr. Tyehimba’s second statement when the state thought the meeting made him less certain despite Mr. Tyehimba’s belief-that there had been a miscommunication with the officer, ■
• On cross examination of Mr. Tyehim-ba, without the state or the witness complaining, the judge told the witness, “And let me be clear. If you are being asked a question that is confusing and you don’t understand it, say it, and I will make them rephrase it.
• On cross examination of Mr. Tyehim-ba about whether, Detective Vappie made him uncomfortable during his interviews, without the state or the witness complaining, the judge interrupted and corrected the defense attorney, making her restate'the question three times.
• The defense was berated by the judge during cross examination of Mr. Tyehimba. But when the state had him *280 on re-direct, and was asking leading questions, the defense-objected and the judge replied, “Can she get the question out by chance?”
• The defense objected when the state made an in globo tender of fifty-three photos, labeled A-QQ, some of which were duplicative and others were more prejudicial than probative. The judge asked for specifics, but when the defense attempted to answer, the judge attacked the use of the word “believe” in describing the photos and markings, and then allowed all of the photos, with the sarcastic conclusion, that, “I believe-that the defense’s argument has no merit.” The state’s use of the word “believe” in objections is not questioned. The judge reprimand of .the defense for .using, the words “believe” or “think” continued.
• The judge “testified to” events that happened earlier, out of the jury’s presence, in response to a defense objection to an exhibit because they had la^not received discovery, tacitly calling the defense attorney a liar: “Okay. Well in light of the fact that you have seen it this morning, I am, overruling your objection and will allow that it be published to the jury.”
• When the defense made objections, instead of sustaining them, the judge repeatedly coached the state to rephrase until the state asked the same thing in a way that the judge could overrule the objection.
• During closing arguments, the judge reprimanded defense counsel to use the microphone to object. The judge allowed the prosecutor to infer that the defense was improper in meeting with witnesses. When the prosecutor taunted the defense with “How about you just say how you really feel about Detective Vappie?” in response to defense counsel’s objections as to facts not in evidence and personal comments, the judge overruled them and said, “I haven’t heard a name mentioned.” .
■ Upon a thorough review of all instances cited by defendant, the majority of the cited comments involve the trial court’s moderating function during trial. La. C.E. art.'611.
One instance cited occurred during closing argument; however, in Louisiana, prosecutors are afforded “wide latitude in choosing closing argument tactics.” State v. Augustine, 13-0164, p. 9 (La.App. 4 Cir. 12/4/13), 131 So.3d 109, 155, citing State v. Clark, 01-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183. “[E]ven when prosecutors have exceeded that, latitude, courts have often criticized the improper arguments without finding that they .constituted, reversible error.” State v. Smith, 11-0091, p. 29 (La.App. 4 Cir. 7/11/12), 96 So.3d 678, 695. Likewise, “even if the prosecutor exceeds .these bounds, the court will not reverse a conviction unless ‘thoroughly convinced’ that the argument influenced the jury and cqntrib-uted to the verdict.” State v. Allen, 12-1757, p. 3 (La.App. 4 Cir. 10/9/13), 126 So.3d 675, 678, citing State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036. As noted earlier herein, the testimony of the two eyewitnesses to the shooting was clearly the basis of the jury’s verdict of guilty in this case.
| ¾,⅜As for King’s objection concerning state’s witness Javon’s Fifth Amendment right, Javon spoke with his counsel and testified voluntarily, denying that he identified King as the shooter. Javon was not implicated in this crime-or any other;. He said he did not remember giving a statement to Detective Vappie, so the state played the tape to refresh his' memory.
In the instance King claims the judge implied- defense counsel was making im *281 proper argument or was lying; the record does not support this assertion. The trial judge corrected defense counsel as to her repeatedly asking leading questions of her witnesses, but did not imply defense counsel was making improper argument. Nor did the trial judge accuse the defense of lying. The judge overruled the.defense objection to the introduction of the victim’s picture on the ground it had not seen the picture during discovery. However, the judge reminded defense counsel she had seen the picture prior to the start of trial. We do not find King could have been prejudiced or denied a fair trial by the jury seeing the victim’s picture, especially considering the defense did not deny that the victim was killed. Moreover, the picture was not gruesome for it was a picture taken when the victim was alive.
Nevertheless, even if error was present in any of the instances cited by the defendant, the errors are subject to a harmless error analysis. State v. Biggins, 12-0015, pp. 13-14 (La.App. 4 Cir. 10/23/13), 126 So.3d 770, 784.
Given the weight of the two eyewitnesses to the shooting, Brione Hawkins and Sheneka Patin, who knew both the victim and King and were standing only feet from the victim when he was killed, King’s argument that the comments prejudiced the jury against him and denied him a fair trial are meritless because any error' did not contribute to the verdict.
12pln addition, King further cites other instances in which he claims the judge misapplied the hearsay rule:
• When the defense objected to- the state’s requesting that a .witness repeat her prior statement to police and she was not giving .the expected answers, the judge cut.. off the grounds for the objection and said, ■ “It’s not hearsay if she’s saying what she said.”
• During a detective’s testimony, he began to repeat second or third hand information from district officers and . King objected, with the judge responding, “Well again, it is a little premature but I’m sure the detective knows that he can’t testify as to what someone else told you, again, unless if falls within one of the exceptions to the hearsay rules. So what was the question again?,” schooling the witness to repeat the hearsay without actually quoting it. After the detective twice repeated hearsay without quoting it verbatim, King objected again and the judge responded, “Overruled. He did not state what someone in particular told him. He said what information he had received.” Bolstered by the previous hearsay ruling, the state then asked the detective for hearsay, and the defense objection was overruled.
• When Javon insisted he was not slapped, the state asked the question, “Is anybody at the school telling your mom about you being slapped?,” and the defense objected on the basis of hearsay. The judge responded, “Well she didn’t ask what someone said. She just asked is anyone at the school telling your mom about you being slapped. He can answer that, that doesn’t call for hearsay.” The judge’s ruling gave credibility to the premise that Javon was slapped and allowed triple hearsay.
• The tape of Javon’s statement to police was played under the guise that he could not remember it, when in fact, he was recanting it. The defense’s hearsay objection to the tape, ■ which also included his mother repeating neighborhood gossip as to *282 what started the incident and who did the shooting. The judge said, after the tape was played, “So, it’s irrelevant. She’s turned the tape off.” ■
• During Detective Vappie’s testimony, the state had learned to ask the questions without directly asking for a quote from the declarant, usually by asking leading' questions. The defense’s hearsay objections were overruled. For example, to the question, “And did he confirm, in fact, for you, in fact, that he had been slapped”?, the judge said, “Overruled. I don’t believe a question called for him to say exactly what someone said to him.”
• The judge repeated the misinterpretation of the hearsay rule in regard to the detective’s testimony about his conversation with Mr. Tyehimba. He was allowed to testify as to whether Mr. Tyehimba gave King’s name when the state said, “Judge, this is the only way that he can explain. I’m sorry,” to |afiwhich the judge replied, “And I overruled you, Defense, because she did not ask him to state exactly what that witness said. So it was not hearsay.”
• Through inadmissible hearsay, over defense objection, the state was allowed to introduce that the gun was a 9.millimeter and put it in King’s possession, none of which was in evidence through actual witnesses at the time, and no weapon was ever located.
La. C.E. art. 801 C.defines hearsay as “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to .prove the truth of the matter asserted.” See State v. Falkins, 12-1654, p. 15 (La.App. 4 Cir. 7/23/14), 146 So.3d 838, 849. Hearsay is ordinarily not admissible except as provided by the Code of Evidence or other legislation. La. C.E. art. 802. Moreover, a trial court’s ruling on the admissibility of evidence will not be disturbed on appeal absent a clear abuse of the trial court’s discretion. State, v. Bell, 05-0808, p. 12 (La.App. 4 Cir. 12/6/06), 947 So.2d 774, 781; State v. Lewis, 97-2854, p. 20 (La.App. 4 Cir. 5/19/99), 736 So.2d-1004, 1017. A trial court is vested with- much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. Hall, 02-1098, p. 8 (La.App.4 Cir. 3/19/03), 843 So.2d 488, 496; La. C.E. art. 403.
After reviewing the foregoing instances pointed out by the defendant, we find the trial judge correctly construed the hearsay rule in most of the complained-of instances (prior statements by the witness, impeachment by use" of prior inconsistent statements, et cetera). In other instances, the witness was giving information under the res gestae exception (police investigation) to the hearsay rule, or the information objected to in other instances gained admission through an earlier witness’ testimony (cumulative), to which the defense did not object.
Even if error existed because in the foregoing instances the trial judge allowed the introduction of inadmissible hearsay, the error would be harmless l27given the substantial evidence of King’s guilt. See Falkins, 12-1654, p. 15, 146 So,3d at 849. “Nevertheless, even if the complained of testimony was improperly allowed as an exception to the hearsay rule, the Supreme Court has long held that the admission of. hearsay testimony is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial.”' State v. Everett, 11-0714, p. 19 (La.App. 4 Cir. 6/13/12), 96 *283 So.3d 605, 621, citing State v. Johnson, 389 So.2d 1302, 1306 (La.1980).
This assignment of error is meritless.
IV.
CONCLUSION
King’s conviction and sentence are affirmed and the motion to supplement the record is denied.
AFFIRMED; MOTION TO SUPPLEMENT DENIED.

. Ms. Makell’s name is alternatively spoiled "Mikell” in the appellate record.

. Dr, DeFatta’s name is alternatively spelled "DaFatta” in the appellate record.

.Detective Bender’s name is alternatively spelled "Binder” in the record.

. Detective Vappie's given name is alternatively spelled "Jeffery” in the appellate record,

. In the transcript of Detective Vappie’s trial testimony, Ms. Hawkins’ first name is incorrectly spelled ‘‘Briana.” Ms. Hawkins testified at trial that her first name was spelled “Brione.”

. Ms. Patin’s given name also appears in the record as “Shemeka" and "Shanieka.” We elect to spell her name as she spelled it for the trial court.

. Reversed on other grounds, State v. Salinas, 97-2930 (La.9/25/98), 719 So.2d 1035.

. Contrary to King’s representation, in response to the question concerning whether he knew if the shooting was a drive-by, Detective Vappie said King said he did not know how the shooting occurred. ■